466 S.E.2d 424

**APPALACHIAN POWER COMPANY, Duquesne Light Company, Monongahela Power Company, Ohio Power Company, The Potomac Edison Power Company, Virginia Electric and Power Company, and West Penn Power Company, Plaintiffs Below, Appellants**

v.

**STATE TAX DEPARTMENT OF WEST VIRGINIA and Charles O. Lorensen, State Tax Commissioner of West Virginia, Defendants Below, Appellees**

No. 22795.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 20, 1995.

Decided Dec. 8, 1995.

---

578

Robert E. Magnuson, William W. Booker, Kay, Casto, Chaney, Love & Wise, Charleston, for Appellants Appalachian Power Company, Duquesne Light Company, and Ohio Power Company.

Silas B. Taylor, Managing Deputy Attorney General, for Appellees.

Louis S. Southworth II, Jackson & Kelly, Charleston, for Appellants Monongahela Power Company, The Potomac Edison Power Company, Virginia Electric and Power Company, and West Penn Power Company.

CLECKLEY, Justice:

The plaintiffs below and appellants herein, Appalachian Power Company, et al.,[1] appeal an order of the Circuit Court of Kanawha County finding that a legislative regulation, 110 W.Va.C.S.R. 13, § 1a.2.11 (1990), is a valid and enforceable regulation properly interpreting W.Va.Code, 11–13–2n(a)(1) (1990).[2] In reaching its decision, the circuit court found there was no express or implied deduction for company use or line loss provided in W.Va.Code, 11–13–2n(a)(1). In its order, the circuit court rejected each of the plaintiffs' exceptions. We affirm this ruling.

## I.

### FACTS AND PROCEDURAL HISTORY

A general overview of this litigation is necessary for a proper resolution of the issues upon which we granted the petition for appeal. During the First Extraordinary Session of 1989, the West Virginia Legislature enacted the West Virginia Fiscal Responsibility Act of 1989, which imposed additional taxes. One of the new sections, W.Va.Code,

---

1. The plaintiffs are the Appalachian Power Company, Duquesne Light Company, Monongahela Power Company, Ohio Power Company, The Potomac Edison Company, Virginia Electric and Power Company, and West Penn Power Company. The defendants are the State Tax Department and the State Tax Commissioner who is currently James H. Paige III.

2. W.Va.Code, 11–13–2n, was amended in 1995. However, the changes do not affect the resolution of this case.

11–13–2n, taxed the "net generation [of electricity] available for sale[.]"

In June, 1989, the Tax Commissioner filed a proposed regulation that interpreted W.Va. Code, 11–13–2n. This initial proposed regulation defined company use and line loss and permitted plaintiffs to deduct these two costs in order to determine the "net generation available for sale."[3] The attorneys for some of the plaintiffs wrote to the State Tax Department, one of the defendants below and appellees herein, concerning the June, 1989, regulation. These plaintiffs noted they agreed with the Tax Commissioner's general definitions, but objected to the 1.5 percent cap on line loss as being arbitrary.

Subsequently, in August, 1989, the Tax Commissioner changed his position and issued a revised set of proposed rules interpreting W.Va.Code, 11–13–2n. These revised rules prohibited the deduction of either line loss or company use to determine "net generation available for sale." The revised regulation provides:

"1a.2.11 'Kilowatt hours of net generation available for sale that was generated or produced in this State' means gross West Virginia electric energy generation less station use, as defined in these regulations. 'Kilowatt hours of net generation available for sale that was generated or produced in this State' *shall not be reduced by company use, line loss or any other use, loss or deduction, except station use,* as defined in these regulations.

"1a.2.12 'Line loss' means loss of electrical energy by electrical resistance and electromagnetism occurring from or in electrical transmission lines or apparatus between any two points along such transmission lines or apparatus." (Emphasis added).[4]

The Tax Commissioner also issued a document entitled "Public Comments on the Business and Occupation Tax Regulations Filed on October 12, 1989" and "Agency Approved West Virginia Legislative Regulations." On October 12, 1989, the Tax Commissioner filed another "Notice of a Comment Period On a Proposed Rule," which permitted comments up to November 13, 1989.

Incident to consideration of the proposed rule by the Legislature, Deborah A. Graham, counsel to the Legislative Rulemaking Committee, prepared a written analysis of the revised rule. Ms. Graham noted that the revised rule conflicted with the statute. The analysis specifically noted "[i]t is counsel's opinion that the language of the statute is clear and unambiguous when it refers to *net generation available for sale* and that the intent of the statute is to tax that electricity which is ultimately sold to the consumer."

3. The initial regulation read, in pertinent part:
"1a.2.2 'Company use' means that amount of electrical energy, excluding station use, used to construct, maintain or operate generation, transmission, office or other facilities of the taxpayer in West Virginia, used in the conduct of any electric utility business in West Virginia or any electric energy generation business in West Virginia.
* * * * * *
"1a.2.11 'Kilowatt hours of net generation available for sale that was generated or produced in this State' means net kilowatt hours generated or produced in West Virginia less both company use and line loss as herein defined.
"1a.2.12 'Line loss' means the amount of loss of electrical energy occurring in or attributable to transmission lines, facilities or apparatus in West Virginia. For purposes of these regulations, line loss is line loss at transmission levels at which power is exported out of the State of West Virginia. Line loss shall in no case exceed 1.5% of net kilowatt hours generated or produced in West Virginia."

4. "Company use" and "station use" were defined as follows:
"1a.2.2 'Company use' means that amount of electrical energy, excluding station use and line loss, used to construct, maintain or operate generation, transmission, office or other facilities of the taxpayer in West Virginia, used in the conduct of any electric utility business in West Virginia or any electric energy generation business in West Virginia.
* * * * * *
"1a.2.22 'Station use' or 'plant use' means *that amount of electric energy used by a* generating station in the production of electricity and general operation of the generating station. The term 'station use' or 'plant use' includes the energy used for pumping water for purposes of providing stored energy at a pumped storage hydroelectric plant. 'Station use' or 'plant use' does not include company use or line loss."

(Emphasis in original). The Tax Commissioner responded to Ms. Graham's analysis in a letter dated November 3, 1989. According to this letter, the original regulations were changed because they were based on an erroneous interpretation by the drafters. At a hearing on November 14, 1989, the Legislative Rulemaking Committee approved the revised rule. The Legislature passed an omnibus bill approving promulgation of the regulations proposed by various executive agencies on March 10, 1990. Under the authority of that act, the rules involved here were promulgated by the Tax Commissioner to be effective August 31, 1990.

The plaintiffs filed a complaint in the Circuit Court of Kanawha County stating four claims for relief: (1) statutory authority and jurisdiction was exceeded; (2) emergency rules are invalid and unenforceable; (3) the defendants failed to provide a statutory comment period; and (4) the administrative exemption of certain manufacturers, but not the plaintiffs, violated equal protection principles. The plaintiffs eventually withdrew their claims for relief based on the failure to provide a statutory comment period and on the unenforceability of emergency rules.

Following a one-day trial, the circuit court signed and filed, without modification, the "Proposed Findings of Fact and Conclusions of Law of Defendants State Tax Commissioner and State Tax Department." On September 23, 1994, the court entered an "Amended Final Order" that corrected the caption of the final order, but made no further modifications. In the final order, the circuit court (1) dismissed the procedural counts of the complaint abandoned by the plaintiffs; (2) held the challenged regulation was valid; (3) held W.Va.Code, 11–13–2n(a)(1) did "not contain an express or implied deduction for post-generation, post-transmission 'company use' or for any 'line loss' occurring after the point of generation"; and (4) held that exempting the tax generation of manufacturers did not violate the Equal Protection Clause.

On appeal, the plaintiffs assert the language of W.Va.Code, 11–13–2n, is clear and unambiguous and, as a matter of law, excludes company use and line loss from the calculation of "net generation [of electricity] available for sale." It is also argued that the legislative regulation, 110 W.Va.C.S.R. 13, § 1a.2.11, is unconstitutional because it attempts to improperly exercise the authority of the Legislature and violates equal protection principles by excluding manufacturers that generate electric power for their own use without providing similar exclusions for the plaintiffs. The defendants, on the other hand, argue that (1) production taxes are traditionally based on quantities produced for sale and not on quantities actually delivered to the retail market, (2) the Tax Commissioner's interpretation is entitled to great weight, and (3) the plaintiffs' equal protection argument has no factual or legal basis.

## II.

## DISCUSSION

We take up two questions: (1) whether the clear language of W.Va.Code, 11–13–2n, precludes the Tax Department's interpretation of the power companies' tax burdens as embodied in 110 W.Va.C.S.R. 13, § 1a.2.11; and (2) whether the rule in question impermissibly differentiates between like entities and thereby violates equal protection principles. We examine each in turn.

### A.

### *W.Va.Code, 11–13–2n*

As stated above, the defendants' interpretation of W.Va.Code, 11–13–2n defines the words "kilowatt hour of net generation available for sale" to include company use and line loss, 110 W.Va.C.S.R. 13 § 1a.2.11. The plaintiffs argue that company use and line loss should be excluded from the "net generation available for sale" because such expenses are not amounts that are actually available for sale. Our ultimate task is to determine whether the disputed statutory language is ambiguous and, if so, whether the defendants' interpretation is a reasonable and permissible construction of the statute.

Interpreting a statute or a regulation presents a purely legal question subject

to *de novo* review.[5] *See State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.*, 194 W.Va. 770, 777, 461 S.E.2d 516, 523 (1995); *Mildred L.M. v. John O.F.*, 192 W.Va. 345, 350, 452 S.E.2d 436, 441 (1994). Nevertheless, the availability of plenary judicial review "does not obviate the devoir of persuasion in a . . . [taxation] case in which a plaintiff challenges the validity of the regulatory mosaic." *Commonwealth of Massachusetts, Dept. of Public Welfare v. Secretary of Agric.*, 984 F.2d 514, 521 (1st Cir.), *cert. denied sub nom. Massachusetts Dept. of Public Welfare v. U.S.*, — U.S. —, 114 S.Ct. 81, 126 L.Ed.2d 49 (1993). An inquiring court—even a court empowered to conduct *de novo* review—must examine a regulatory interpretation of a statute by standards that include appropriate deference to agency expertise and discretion.

▇▇▇▇ Judicial review of an agency's construction of a statute that it administers involves two separate but interrelated questions, only the second of which furnishes an occasion for deference. We discussed this rule of statutory construction in our recent case of *Sniffin v. Cline*, 193 W.Va. 370, 373–74, 456 S.E.2d 451, 454–55 (1995):

"In deciding whether the DMV's position should be sustained, we apply the standards set out by the United States Supreme Court in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We first ask whether the Legislature has 'directly spoken to the precise [legal] question at issue.' *Chevron*, 467 U.S. at 842, 104 S.Ct. at 2781, 81 L.Ed.2d at 702–03. 'If the intention of the Legislature is clear, that is the end of the matter.' *Id.* If it is not, we may not simply impose our own construction of the statute. 'Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the [DMV's] answer is based on a permissible construction of the statute.' *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782, 81 L.Ed.2d at 703. *See Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 696–98, 111 S.Ct. 2524, 2534, 115 L.Ed.2d 604, 623–25 (1991). In the present case, it is clear that the Legislature has not spoken to the precise question at issue. Therefore, we review the DMV's decision to determine whether its construction is one the Legislature would have sanctioned. *See United States v. Shimer*, 367 U.S. 374, 383, 81 S.Ct. 1554, 1560–61, 6 L.Ed.2d 908, 915 (1961)."

Once again, *Chevron* and its progeny provide the analytical framework for our decision.[6] We must first determine how the

---

5. Generally, this Court reviews findings of fact for clear error and conclusions of law *de novo*. However, ostensible "findings of fact," which entail the application of law or constitute legal judgments which transcend ordinary factual determinations, must be reviewed *de novo*. *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 500–01, 104 S.Ct. 1949, 1959, 80 L.Ed.2d 502, 516–17 (1984); *Powell v. Texas*, 392 U.S. 514, 521–22, 88 S.Ct. 2145, 2148–49, 20 L.Ed.2d 1254, 1261–62 (1968); *State v. Farley*, 192 W.Va. 247, 452 S.E.2d 50 (1994). Moreover, mixed questions of law and fact, like pure questions of law, or those involving statutory interpretations, are most often reviewed *de novo*. Most significantly, the sufficiency of the information presented at trial to support a finding that a constitutional predicate has been satisfied presents a question of law. *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 685–89, 109 S.Ct. 2678, 2694–96, 105 L.Ed.2d 562, 587–90 (1989). Because most, if not all of the lower court's findings in the instant case constitute ultimate facts and interrelated applications of the law, economic and taxation judgments, mixed questions of law and fact, and/or findings designed to support "constitutional facts" (to-wit: the existence of a class or a fundamental right which has been invaded), they are subject to plenary review.

6. *Chevron*, of course, was a watershed decision in the area of judicial deference to regulatory agencies. Significantly, however, *Chevron* involved a properly promulgated "federal" *legislative* rule. We emphasize "federal" because there is a substantial difference between legislative rules in West Virginia and those on the federal level. Federal legislative rules do not require a specific Act of Congress authorizing them. Under the Federal Administrative Procedures Act, rules may be either legislative or nonlegislative. A legislative rule must be promulgated according to the notice and comment procedures of Title 5 U.S.C. § 553. A legislative rule that is not promulgated in accordance with these requirement is not entitled to the force of law. *See, e.g., Batterton v. Francis*, 432 U.S. 416, 425–26 n. 9, 97 S.Ct. 2399, 2405–06 n. 9, 53 L.Ed.2d 448, 456–57 n. 9 (1977); *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–03, 99 S.Ct. 1705, 1717–18, 60 L.Ed.2d 208, 225–26 (1979). A federal agency may adopt and promulgate legislative rules as a

*Chevron* analysis is affected by legislative rules in West Virginia and our recent decision in *Kincaid v. Mangum,* 189 W.Va. 404, 432 S.E.2d 74 (1993), that precludes us from giving controlling weight to omnibus bill legislation without first· giving it careful scrutiny.

 Under West Virginia law, there are three types of rules—legislative, interpretive, and procedural. We are not concerned with procedural rules in this case. Legislative rules are those "affecting private rights, privileges or interests," in what amounts to a legislative act. W.Va.Code, 29A-1-2(i) (1982). Legislative rules have "the force of law[.]" W.Va.Code, 29A-1-2(d) (1982). *See also Chico Dairy Co. v. West Va. Human Rights Comm'n,* 181 W.Va. 238, 382 S.E.2d 75 (1989) (to be valid, the promulgation of legislative rules must be authorized by the West Virginia Legislature). Interpretive rules, on the other hand, do not create rights but merely clarify an existing statute or regulation. *See* W.Va.Code, 29A-1-2(c) (1982). Because they only clarify existing law, interpretive rules need not go through the legislative authorization process. *See* W.Va.Code, 29A-3-1, *et seq.; Chico Dairy*

*Co. v. West Virginia Human Rights Comm'n, supra.* Although they are entitled to some deference from the courts,[7] interpretive rules do not have the force of law nor are they irrevocably binding on the agency or the court.[8] They are entitled on judicial review only to the weight that their inherent persuasiveness commands. We believe that *Gilbert* furnishes the appropriate analysis for reviewing interpretive rules:

" 'We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.' " 429 U.S. at 141–42, 97 S.Ct. at 411, 50 L.Ed.2d at 357–58, *quoting Skidmore,* 323 U.S. at 140, 65 S.Ct. at 164, 89 L.Ed. at 129.

lawful delegation of legislative authority. Being concerned with legislative rules only, *Chevron* simply did not deal with the level of consideration a court should give to an interpretive rule.

Indeed, in the years following *Chevron,* the Supreme Court reaffirmed its classic standard in *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124, 129 (1944) (interpretive rules are not binding on a reviewing court but serve only as a source of guidance). In *Martin v. Occupational Safety and Health Review Commission,* 499 U.S. 144, 157, 111 S.Ct. 1171, 1179, 113 L.Ed.2d 117, 132 (1991), the Supreme Court, citing *Skidmore,* opined that interpretive rules are *not* "entitled to the same deference as norms that derive from the exercise of the Secretary's delegated lawmaking powers[.]" This approach was reaffirmed three decades after *Skidmore* in *General Electric Co. v. Gilbert,* 429 U.S. 125, 141–42, 97 S.Ct. 401, 410–11, 50 L.Ed.2d 343, 357–58 (1976), *superseded by statute/rule as stated in Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). where the Supreme Court analyzed an EEOC guideline as an interpretive rule under the *Skidmore* doctrine. It is therefore manifest that *Skidmore* and *Gilbert* survived *Chevron.*

7. Under *Gilbert,* an interpretive rule is entitled to some deference, but it is not to be given the full

*Chevron* deference that applies to "legislative" rules. We are obligated to give appropriate consideration to all agency interpretations (which many of our cases have referred to as deference). Then we must decide how much *weight* the interpretation should receive. To say that we give it "no deference" implies that we do not even consider the interpretation, which is not the case. We refuse to become a "rubber stamp" for an agency's action. But, it is more accurate to say that interpretive rules are not to be given controlling weight than it is to say that they. would be given no deference. There is, indeed, a great danger in giving *Chevron* deference (and often legislative effect) to rules promulgated without the benefit of legislative oversight.

8. We merely mean that an agency is free to revise and adopt interpretive rules prospectively. Of course, an agency must follow and apply its rules and regulations in existence at the time of agency action. W.Va.Code, 29A-1-2(c) states that "an interpretive rule is admissible for the purpose of showing that the prior conduct of a person was based on good faith reliance on such rule. The admission of such rule in no way affects any legislative or judicial determination regarding the prospective effect of such rule."

Most of our cases fail to make a distinction between legislative and interpretive rules for purposes of rule construction.[9] This failure justifiably follows from the fact that legislative rules in West Virginia are authorized by acts of the Legislature and we have treated them, as they should be, as statutory enactments. What distinguishes interpretive rules from legislative rules is the legal base upon which the rules rest. What complicates our path today is the Legislature's practice of approving legislative rules as part of omnibus legislation. To divine the nature and the validity of the rule in this case, it is helpful to understand the nature of omnibus legislation generally and the problems created by this manner of legislating. We, therefore, find it necessary to address the applicability of *Chevron* to both legislative rules in West Virginia and more pertinent to omnibus legislation.

▇▇▇▇ The plaintiffs attack the constitutionality of 110 W.Va.C.S.R. 13, § 1a.2.11, asserting the Legislature violated the one-object rule and generally exercised its authority in an unconstitutional manner by adopting the regulation in question through an omnibus bill. Section 30 of Article VI of the West Virginia Constitution states that legislation may embrace only one subject, which must be expressed in its title. As discussed in *Kincaid*, the purpose of these requirements is (1) to prevent from combining into one bill several diverse measures which have no common basis and which are combined together out of fear that separately each could not receive a favorable vote on its merits; (2) to prevent the unintentional and unknowing passage of provisions inserted in a bill for which the title gives no information;

and (3) to fairly apprise the public of matters which are contained in the various bills and to prevent fraud and deception as to matters passed by the Legislature. Although not pertinent here, a fourth justification might be to prevent the dilution of a governor's veto power that would result if the legislation is saddled with irrelevant riders opposed by a governor. *See generally*, Millard H. Ruud, *"No Law Shall Embrace More than One Subject"*, 42 Minn.L.Rev. 389 (1958).

▇▇▇▇ The plaintiffs concede that *Kincaid* clearly establishes two propositions: "(1) That the practice of enacting legislative rules in an omnibus bill is prospectively invalid; and (2) That rules previously enacted in that manner must be given special scrutiny." In Syllabus Point 1 of *Kincaid v. Mangum, supra*, this Court discussed the importance of the Legislature exercising its authority in an appropriate manner:

> " 'While the Legislature has the power to void or to amend administrative rules and regulations, when it exercises that power it must act as a legislature, within the confines of the enactment procedures mandated by our constitution. It cannot invest itself with the power to act as an administrative agency in order to avoid those requirements.' Syl. pt. 2, *State ex rel. Barker v. Manchin*, 167 W.Va. 155, 279 S.E.2d 622 (1981)."

We found that legislating by an omnibus bill violates the one-object rule; however, we also found that because of the severe burden it would place on the Legislature and State agencies, the *Kincaid* holding would apply only prospectively.[10]

---

**9.** In *Equal Employment Opportunity Commission v. Arabian American Oil Co.*, 499 U.S. 244, 259–60, 111 S.Ct. 1227, 1236–37, 113 L.Ed.2d 274, 289–90 (1991), *superseded by statute as stated in Landgraf v. USI Film Products*, —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), Justice Scalia concurred, opining that the interpretive rule was entitled to *Chevron* deference and that *Gilbert* was "an anachronism[.]" It is clear, however, that the majority held *Chevron* was not applicable.

**10.** After reviewing the omnibus bill passing 110 W.Va.C.S.R. 13, § 1a.2.11, it is clear this is the form of omnibus bill that we were concerned about in *Kincaid v. Mangum, supra*. The bill in

question groups together many different rules without any rational basis for the grouping. Additionally, the bill does not include the full text of any of the rules it covers. In fact, 110 W.Va. C.S.R. 13, § 1a.2.11 is never specifically mentioned in the bill. The omnibus bill contained a general provision authorizing the promulgation of all the relevant rules subject only to the changes mentioned in the bill. Thus, if the Legislature made no changes to 110 W.Va.C.S.R. 13, § 1a2.11, it is reasonable to believe that the Legislature did not specifically register its approval of this particular rule and instead relied on the general provisions permitting rule promulgation.

The omnibus bill in question is a prime example of the potential evils that could "lead to logrolling or other deceiving tactics[.]" Syl. pt. 2, in part, *Kincaid v. Mangum, supra.* The omnibus bill in the case *sub judice* was passed in 1990. *Kincaid* was not decided until 1993. Because of our determination that *Kincaid* should have prospective application only, we refuse to declare the rule in this case unconstitutional. On the other hand, *Kincaid* requires that we give the rule careful scrutiny.

In doing so, we underscore the importance of the legislative process that led to its approval by the West Virginia Legislature. *Chico Dairy Co. v. West Virginia Human Rights Comm'n, supra.* This process required the proposed rule go through two distinct review stages. First, the proposed regulation was reviewed by a legislative rule-making committee.[11] Second, the committee's final responsibility was to make a recommendation to the full Legislature either to authorize the agency to promulgate the proposed rule or to take other curative action. Significantly, under W.Va.Code, 29A–3–11(d), the committee was required to include language in the bill authorizing the legislative rule in the form of a legislative finding "that the rule is within the legislative intent of the statute which the rule is intended to implement, extend, apply or interpret[.]"

Once a disputed regulation is legislatively approved, it has the force of a statute itself. Under ordinary circumstances, an omnibus bill should be independently evaluated under the first stage of the *Chevron* analysis. Being an act of the West Virginia Legislative, it is entitled to more than mere deference; it is entitled to controlling weight. As authorized by legislation, a legislative rule should be ignored only if the agency has exceeded its constitutional or statutory authority or it is arbitrary or capricious. *See* West Virginia Code, 29A–4–2 (1982). Under this scenario, unless we are persuaded by the plaintiffs' arguments attacking the rule's constitutionality, or for other reasons stated above, the plaintiffs must lose under the "clear legislative intent" doctrine. We, however, have decided to give the plaintiffs the benefit of the doubt and evaluate the omnibus bill and the legislative rule under the second stage of *Chevron* consistent with our mandate in *Kincaid* requiring that omnibus bills be given careful scrutiny.[12] As will be discussed more fully below, we have examined the legislative history leading up to the pertinent section of the omnibus bill and we find it was given specific, careful, and appropriate legislative consideration. Additionally, there are two presumptions that cannot be ignored. First, the Legislature is presumed to have known and understood the laws they had earlier enacted. *State ex rel. Smith v. Maynard,* 193 W.Va. 1, 8–9, 454

11. Under W.Va.Code, 29A–3–11(b) (1995), this committee is charged, among other things, with the responsibility of reviewing the following factors:

"(1) Whether the agency has exceeded the scope of its statutory authority in approving the proposed legislative rule;

"(2) Whether the proposed legislative rule is in conformity with the legislative intent of the statute which the rule is intended to implement, extend, apply, interpret or make specific;

"(3) Whether the proposed legislative rule conflicts with any other provision of this code or with any other rule adopted by the same or a different agency;

"(4) Whether the proposed legislative rule is necessary to fully accomplish the objectives of the statute under which the proposed rule was for promulgation;

"(5) Whether the proposed legislative rule is reasonable, especially as it affects the convenience of the general public or of persons particularly affected by it;

"(6) Whether the proposed legislative rule could be made less complex or more readily understandable by the general public; and

"(7) Whether the proposed legislative rule was proposed for promulgation in compliance with the requirements of this article and with any requirements imposed by any other provision of this code."

12. This Court has spoken to the legislative review of administrative rules or regulations on several occasions, while the process of legislative review has itself matured and adjusted considerably since its inception. *See State ex rel. Meadows v. Hechler,* 195 W.Va. 11, 14–17, 462 S.E.2d 586, 590–93 (1995) (discusses the history of legislative rulemaking review). We recognize that such is a dynamic, ongoing development. Accordingly, it should not be presumed that all we have said prior to today's ruling precisely controls or limits the ongoing development by the Legislature of its suitable role in the review and promulgation of administrative rules or regulations.

S.E.2d 46, 53–54 (1994). Second, " 'courts must presume that a legislature says in a statute what it means and means in a statute what it says there.' " *Martin v. Randolph County Board of Education,* 195 W.Va. 297, 312, 465 S.E.2d 399, 414 (1995), *quoting Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391, 397 (1992).

▮▮▮▮ To recapitulate, in reviewing a rule or regulation of an administrative agency, a reviewing court must first decide whether the rule is interpretive or legislative. If it is interpretive, a reviewing court is to give it only the deference it commands after considering the factors discussed in *Skidmore.* If it is a legislative rule, the court first must determine the rule's validity under *Chico* and *Kincaid.* Assuming validity, the appropriate level of consideration due it depends on its clarity as a legislative rule. If the legislative rule is valid, clear as to its intent and not contrary to the legislative enactment that triggered its promulgation, the need for further review does not arise. It becomes the court's duty to apply the rule as written. This in essence is the first step of *Chevron.* If the rule is valid under *Chico,* meaning it has gone through the legislative review committee process and has been authorized into law by the Legislature, but was approved as part of omnibus legislation that we condemned in *Kincaid* necessitating careful scrutiny, we proceed to step two of the *Chevron* analysis.[13] In step two, we are limited to reviewing whether the agency's construction is "permissible."

▮▮▮▮ In performing the first part of the *Chevron* analysis, no deference is due the agency. Instead, a court must look primarily to the plain meaning of the statute, drawing its essence from the "particular statutory language at issue, as well as the language and design of the statute as a whole." *K mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291,

108 S.Ct. 1811, 1818, 100 L.Ed.2d 313, 324 (1988). *Accord In re Snuffer,* 193 W.Va. 412, 416, 456 S.E.2d 493, 497 (1995). Beyond this point, it remains unclear whether or to what extent a court engaged in the first stage of a *Chevron* inquiry may use other tools of statutory construction, such as legislative history and post-enactment statements of the legislators and their staffs, in searching for the Legislature's unambiguously expressed intent on a particular issue.[14]

Legislative history and other tools of statutory construction are subject to many and varied criticisms, and the uncertainty about their value in general parallels the uncertainty about their value in relation to the *Chevron* doctrine. Respectable authority indicates it is appropriate to employ all the "traditional tools of statutory construction" in the first part of the *Chevron* analysis when the statutory language itself is not dispositive. *See INS v. Cardoza–Fonseca,* 480 U.S. 421, 432–43, 107 S.Ct. 1207, 1213–19, 94 L.Ed.2d 434, 448–55 (1987) (examining legislative history to confirm the validity of an interpretation suggested by the statute's language) (dictum). But there is also respectable support for the proposition that the *Chevron* analysis, at least in its initial phase, does not look beyond the statutory text. *See, e.g., National R.R. Passenger Corp. v. Boston & Me. Corp.,* 503 U.S. 407, 417, 112 S.Ct. 1394, 1401, 118 L.Ed.2d 52, 66 (1992) (deference is due so long as "the agency interpretation is not in conflict with the plain language of the statute"); *K mart Corp. v. Cartier, Inc.,* 486 U.S. at 292, 108 S.Ct. at 1818, 100 L.Ed.2d at 324 ("[i]f the agency regulation is not in conflict with the plain language of the statute, a reviewing court must give deference to the agency's interpretation of the statute"); *NLRB v. United Food & Commercial Workers Union,* 484 U.S. 112, 133–34, 108 S.Ct. 413, 426–27, 98 L.Ed.2d 429, 448–49 (1987) (Scalia, J.,

---

**13.** We also would go to step two of *Chevron* in the unlikely event that we found that a legislative rule, valid in all respects, was itself ambiguous as to its intent or meaning.

**14.** Normally, legislative history in West Virginia is difficult to discover and this Court has not engaged in extensive analysis as to its utility in

statutory construction. This case is quite different, and preenactment and post-enactment legislative history and rule making history could provide significant insight as to legislative intent. For that reason, we discuss the role of legislative history within the context of the *Chevron* doctrine.

concurring) (criticizing dictum in *Cardoza–Fonseca*); *State by Davis v. Hix*, 141 W.Va. 385, 389, 90 S.E.2d 357, 359–60 (1955) ("[w]here the language of ... [a] statute is of doubtful meaning or ambiguous, rules of construction may be resorted to and the construction of such statute by the person charged with the duty of executing the same is accorded great weight").

We think the difference between these two views may, as a practical matter, be more apparent than real. In any event, we do not believe the outcome in this case would be different even if we were to consider legislative history and use other tools of statutory construction at the initial stage of the *Chevron* analysis. Thus, we need not precisely define the function, if any, of legislative history under *Chevron* at this time. Rather, we assume *arguendo*, but do not decide, that an inquiring court may look in that direction during the initial stage of a *Chevron* inquiry.[15] Thus, in determining whether the Legislature has directly spoken to the issues, we will consider not only the plain language of the statute but any pertinent preenactment legislative history.[16]

▮▮▮ On this assumption, the question whether the Legislature has spoken on a particular question involves two smaller steps. We look first to the statute's language. If the text, given its plain meaning, answers the interpretive question, the language must prevail and further inquiry is foreclosed. As we noted in Syllabus Point 2, in part, of *Chico Dairy Company v. Human Rights Commission, supra:*

" 'Rules and Regulations of ... [an agency] must faithfully reflect the intention of the legislature; when there is clear and unambiguous language in a statute, that language must be given the same clear and unambiguous force and effect in the ... [agency's] Rules and Regulations that it has in the statute.' Syl. pt. 4, *Ranger Fuel Corp. v. West Virginia Human Rights Commission*, 180 W.Va. 260, 376 S.E.2d 154 (1988)."

If no such readily apparent meaning springs from the statute's text, we next examine, albeit skeptically, other extrinsic sources, such as the legislative history, in search of an unmistakable expression of legislative intent. "When a statute's language is ambiguous, a court often must venture into extratextual territory in order to distill an appropriate construction. Absent explicatory legislative history for an ambiguous statute ..., this Court is obligated to consider the ... overarching design of the statute." *State ex rel. McGraw v. Scott Runyan Pontiac–Buick, Inc.*, 194 W.Va. at 777, 461 S.E.2d at 523. And if, at that stage, the statute itself, viewed in connection with the statutory design and the legislative history, reveals an unequivocal answer to the interpretive question, the Court's inquiry ends.

▮▮▮ It is only when these efforts do not permit a court to discern an unmistakably clear expression of legislative intent that the *Chevron* inquiry moves into its second stage. Until then, deference is not a consideration—but from that point forward, defer-

---

**15.** In *Kofa v. U.S. Immigration & Naturalization Service*, 60 F.3d 1084, 1088 (4th Cir.1995), the Fourth Circuit stated:

"However, the first place where we must look to see if ... [the legislature] has·spoken to the issue with which we are concerned and whether ... [legislative] intent in that regard is clear is on the face of the statute. Statutory construction must begin with the language of the statute.... To do otherwise would assume that ... [the legislature] does not express its intent in the words of statutes, but only by way of legislative history, an idea that hopefully all will find unpalatable." (Citations omitted).

**16.** We do not believe that post-enactment legislative history is entitled to substantial consideration in construing a statute.

"The use of legislative history in this fashion, and especially postenactment legislative history, is a process that has been soundly criticized.... *Continental Can [Co., Inc.] v. Chicago Truck Drivers, et al.*, 916 F.2d ... [1154, 1157–58 (7th Cir.1990)] (stating that postenactment statements 'do not count' because the term ' "subsequent legislative history" [is] an oxymoron.' (citations omitted); 2B Norman J. Singer, *Sutherland Statutory Construction* § 49.06, at 59 (5th ed. 1992) ('Little weight is given to postenactment statements by members of ... [the legislature]')." *Kofa v. U.S. Immigration & Naturalization Service*, 60 F.3d at 1089.

ence looms large.[17] Under this second stage, a court must examine the agency's interpretation to see how it relates to the statute. This examination involves a high degree of respect for the agency's role. As we noted in Syllabus Point 7, in part, of *Lincoln County Board of Education v. Adkins*, 188 W.Va. 430, 424 S.E.2d 775 (1992): " ' "Interpretations of statutes by bodies charged with their administration are given great weight unless clearly erroneous." ' " (Citations omitted). *See also* Syl. pt. 2, *West Va. Dep't of Health v. Blankenship*, 189 W.Va. 342, 431 S.E.2d 681 (1993); *Boley v. Miller*, 187 W.Va. 242, 418 S.E.2d 352 (1992); *Blennerhassett Historical Park v. Public Serv. Comm'n of W. Va.*, 179 W.Va. 250, 366 S.E.2d 758 (1988). Thus, in this case, the Tax Commissioner need not write a rule that serves the statute in the best or most logical manner; he need only write a rule that flows rationally from the statute.

▮▮▮▮ Our power to review the Tax Commissioner's decisions on policy grounds is extremely limited. We are not at liberty to affirm or overturn the Commissioner's regulation or decision merely on the basis of our agreement or disagreement with his policy implications, even when important issues of taxation are at stake. This Court has stressed the importance of liberally permitting administrative agencies to carry out legislative dictates; we have recognized that aggressive judicial intervention would disrupt agency processes and negate the legislative body's legitimate delegation of authority. *See Frymier–Halloran v. Paige*, 193 W.Va. 687, 694, 458 S.E.2d 780, 787 (1995) ("[d]espite the absence of specific [constitutional] treatment, we have developed doctrines that attempt to define the constitutional role for administrative agencies and to protect them from legislative and judicial overreaching"). We are keenly aware of the invaluable role various agencies play in making government operate efficiently. Thus, we are loathe to engage in the arduous task of rewriting legislation, regulations, and agency structure simply on the whims of a few who have expressed dissatisfaction with an agency's action. We will not set aside a formally adopted legislative rule without clearcut evidence of an inconsistency between the rule and the authorizing statute.

▮▮▮▮ On the other hand, courts do play an important role in the implementation of legislation by acting as a safeguard against bureaucratic excesses. At least under *Chevron*, there is a legitimate role for judicial review of legislative rules.[18] Courts are commanded by *Chevron* to give deference to certain legal conclusions of an agency. But deference "cannot be allowed to slip

---

**17.** As stated in *Snuffer*, 193 W.Va. at 417, 456 S.E.2d at 498, there are situations that the *Chevron* deference need not be given:

"The policy underlying our grant of special deference to agency decisions and similar official agency pronouncements does not extend to every agency action. For example, it would not extend to *ad hoc* representations on behalf of an agency, such as litigation arguments. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213, 109 S.Ct. 468, 474, 102 L.Ed.2d 493, 503 (1988) (little weight should be given to expedient litigation position of an agency). Similarly, an agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning the statute can bear. *Pittston Coal Group v. Sebben*, 488 U.S. 105, 113, 109 S.Ct. 414, 420, 102 L.Ed.2d 408, 419–20 (1988)." (Cleckley, J., concurring).

In addition, there are other circumstances where an agency's rule is not entitled to deference. Once this Court determines a statute's clear meaning, we will adhere to that determination under the doctrine of *stare decisis*. An agency's later determination of the statute is not entitled

to deference but will be judged against that prior judicial determination of the statute's meaning. *See Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 131, 110 S.Ct. 2759, 2769, 111 L.Ed.2d 94, 111 (1990), *superseded by statute as stated in Jones Truck Lines, Inc. v. AFCO Steel, Inc.*, 849 F.Supp. 1296 (1994). Similarly, when the agency's interpretation goes beyond that scope of whatever ambiguity the statute contains, no deference is due. *See City of Chicago v. Environmental Defense Fund*, — U.S. —, —, 114 S.Ct. 1588, 1594, 128 L.Ed.2d 302, 312 (1994).

**18.** Apart from *Chevron*, W.Va.Code, 29A–4–2 expressly provides that an interested party may seek judicial review of *any* rule on the grounds that "the rule violates constitutional provisions or exceeds the statutory authority or jurisdiction of the agency or was adopted without compliance with statutory rule-making procedures or is arbitrary or capricious ..." We interpret this section to authorize meaningful judicial review on any of these grounds mentioned notwithstanding its authorization by legislative enactment.

into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by" the Legislature. *Bureau of Alcohol, Tobacco and Firearms v. Federal Labor Relations Authority,* 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195, 202 (1983) (Citation omitted). Judicial review must not become judicial abdication, and we must carefully consider each case to determine whether deference is warranted and, if so, how much to accord. Joseph F. Weis, Jr., *A Judicial Perspective On Deference to Administrative Agencies: Some Grenades From the Trenches,* 2 Admin.L.J. 301, 307 (1988).[19]

When a legislative rule is constitutionally acceptable, only an unambiguous conflicting statute, contradictory legislative history, a defect in the rulemaking process, evidence of bias or abuse of power, or some other startling revelation of fact would overcome the clearly erroneous burden and justify this Court's interference with an agency's legitimate rulemaking authority. *See Frymier–Halloran v. Paige,* 193 W.Va. 687, 694, 458 S.E.2d 780, 787 (1995) ("[i]t [is] evident that courts will not override administrative agency decisions, of whatever kind, unless the decisions contradict some explicit constitutional provision or right, are the results of a flawed process, or are either fundamentally unfair or arbitrary"). *See also Detch v. Board of Educ. of County of Greenbrier,* 145 W.Va. 722, 729, 117 S.E.2d 138, 142 (1960), *quoting* 73 C.J.S. *Public Administrative Bodies and Procedure* § 104 (" '[i]t is only where an administrative rule or regulation is completely without a rational basis, or where it is wholly, clearly, or palpably arbitrary, that the court will say that it is invalid' "). *MCI Telecommunications Corp. v. Federal Communications Comm'n,* 675 F.2d 408, 413 (D.C.Cir.1982) ("the critical concern of the reviewing court is that the agency provide a coherent and reasonable explanation of its exercise of discretion"). Of course, if the intent of the Legislature is clear, that intent will trump any agency's rule to the contrary. As the United States Supreme Court noted in *Chevron,* where the Legislature has spoken directly to a question, *"the court,* as well as the agency, must give effect to ... th[at] unambiguously expressed intent[.]" 467 U.S. at 842–43, 104 S.Ct. at 2781, 81 L.Ed.2d at 703. (Emphasis added). Thus, a regulation both must implement the statutory purpose and must have a rational basis supporting its adoption.

The Legislature may specifically provide the exact issues to be considered when promulgating a rule. However, "[i]n the absence of ... [legislative] direction as to what elements are to be considered in promulgating ... [a] rule, the presumption is that ... [the Legislature] is entrusting the decision as to what to consider to the hands of the agency in deference to agency expertise." *Kennedy v. Block,* 606 F.Supp. 1397, 1403 (W.D.Va.1985), *vacated on other grounds* 784 F.2d 1220 (4th Cir.1986). We believe that if the Legislature explicitly leaves a gap in legislation, then an agency has authority to fill the gap and the agency is entitled to deference on the question. Thus, an agency's interpretation will stand unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782, 81 L.Ed.2d at 703. The policy favoring deference is particularly important where, as here, a technically complex statutory scheme is backed by an even

19. Thus, our commitment to agency discretion does not authorize the agency to exceed its authority. *Harmon v. Brucker,* 355 U.S. 579, 582, 78 S.Ct. 433, 435, 2 L.Ed.2d 503, 506 (1958). *See Rowe v. West Va. Dept. of Corrections,* 170 W.Va. 230, 292 S.E.2d 650 (1982); *Anderson & Anderson Contractors, Inc. v. Latimer,* 162 W.Va. 803, 807–08, 257 S.E.2d 878, 881 (1979) ("[a]lthough an agency may have power to promulgate rules and regulations, the rules and regulations must be reasonable and conform to the laws enacted by the Legislature"). " 'The judiciary is the final authority on issues of statutory construction and ... [we are obliged to] reject administrative constructions which are contrary to clear ... [legislative] intent.' " *INS v. Cardoza–Fonseca,* 480 U.S. at 447–48, 107 S.Ct. at 1221, 94 L.Ed.2d at 457–58, *quoting Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9, 81 L.Ed.2d at 703 n. 9. This Court has recognized that "an agency's determination of matters within its area of expertise is entitled to substantial weight ... [but that] does not mean a court should shirk its obligation to make a searching and careful inquiry into the facts[.]" *Princeton Community Hospital v. State Health Planning,* 174 W.Va. 558, 564, 328 S.E.2d 164, 171 (1985).

more complex and comprehensive set of regulations. Under such circumstances, the argument for deference is at its strongest.

▐ In this case, considering the totality of the circumstances, we find the legislative intent favoring the regulation to be clear and the contested regulation comports with the language of W.Va.Code, 11–13–2n.[20] We find the contested words "kilowatt hours of net generation available for sale" are ambiguous. The failure of the Legislature to define these words or to enumerate any factors that the Tax Commissioner must consider in deciding such circumstances or characteristics evidences an intent to delegate that determination to the Tax Commissioner. Because this ambiguity cannot be resolved either by preenactment legislative history or by a review of the overarching design of the original statute, the statute is subject to reasonable construction by the administrative agency charged with the duty to carry out these statutory objectives—the defendants (the Tax Department and the Tax Commissioner).

At this juncture, we move to the second stage of the *Chevron* inquiry. We must examine the defendants' interpretation to see

how it relates to the statute and to determine whether the defendants' interpretation of W.Va.Code, 11–13–2n, is reasonable.[21] As emphasized above, this examination involves a high degree of respect for the Tax Department's and the Tax Commissioner's role.

Without question, the Legislature intended the defendants, the Tax Department and the Tax Commissioner, to have the authority to interpret W.Va.Code, 11–13–2n. In fact, W.Va.Code, 11–1–1 (1967), and W.Va.Code, 11–1–2 (1933), describe the creation, structure, and duties of the Tax Department and its personnel. Specifically, W.Va.Code, 11–1–2, provides, in part, that it is the Tax Commissioner's duty to "see that the laws concerning the assessment and collection of all taxes and levies, whether of the State or of any county, district or municipal corporation thereof, are faithfully enforced." Obviously, W.Va.Code, 11–13–2n, fits within the Tax Department's area of expertise.

The parties vigorously debate the appropriate definition of "net generation available for sale." The words "net generation" suggest that the Legislature intended for something to be deducted in order to determine the net of all the electricity generated.[22] Ba-

---

**20.** W.Va.Code, 11–13–2n, reads, in pertinent part:

"(a) *Rate of tax.*—Upon every person engaging or continuing within this state in the business of generating or producing electricity for sale, profit or commercial use, either directly or indirectly through the activity of others, in whole or in part, or in the business of selling electricity to consumers, or in both businesses, the tax imposed by section two [§ 11–13–2] of this article shall be equal to:

"(1) Twenty-six hundredths of one cent times the kilowatt hours of net generation available for sale that was generated or produced in this state by the taxpayer during the taxable year, except that this rate shall be five hundredths of one cent times the kilowatt hours of net generation available for sale that was generated or produced in this state by the taxpayer and sold to a plant location of a customer engaged in manufacturing activity if the contract demands at such plant location exceeds two hundred thousand kilowatts per hour per year or if the usage at such plant location exceeds two hundred thousand kilowatts per hour in a year: Provided, That in order to encourage the development of industry to improve the environment of this state, the tax imposed by this section on any person generating or producing electric power and an

alternative form of energy at a facility located within this state substantially from gob or other mine refuse shall be equal to five hundredths of one cent times the kilowatt hours of net generation or production available for sale. The measure of tax under this paragraph shall be equal to the total kilowatt hours of net generation available for sale that was generated or produced in this state by the taxpayer during the taxable year, regardless of the place of sale or use, or the fact that transmission may be made to points outside this state."

**21.** There being no real dispute concerning the defendants' authority to promulgate rules in this situation and considering the fact that the plaintiffs have shown no evidence of bias, prejudice, or extreme outside influences, *see generally* Charles H. Koch, Jr., Administrative Law and Practice §§ 4.71–4.77 at 273–88 (1985) (discussing the importance of having unbiased administrative rulemaking process), the only other issue in this section is to determine if 110 W.Va.C.S.R. 13, § 1a.2.11 is a reasonable interpretation of W.Va.Code, 11–13–2n.

**22.** Of course, we would find the argument of the plaintiffs more persuasive if the regulation in question excluded all losses including station

sically, these words when viewed in isolation have little meaning. The plaintiffs assert the words "available for sale" mean that any electricity generated that is not specifically charged to a customer should be excluded from taxation. The defendants agree the words "available for sale" are indeed definitive, but assert they define the companies to be taxed, not the time the available electricity becomes subject to the tax. Specifically, the defendants assert that the use of the words "available for sale" is the Legislature's way of limiting the application of the "electricity manufacturing tax to businesses which generate power for the purpose of *selling* such power" to others. (Emphasis in original). Both constructions are consistent with the statute's language. It is here that the *Chevron* analysis strikes its most telling blow to the plaintiffs. Under *Chevron*, we may not impose our own construction of the statute.[23] Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the Court is whether the

Tax Commissioner's answer is based on a *permissible construction* of the statute. *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782, 81 L.Ed.2d at 703. Given the competing policy concerns behind the statute and the industries affected, the language of the statute suggests the Legislature intended the Tax Commissioner to strike the appropriate balance of the goals of the statute in defining "net generation available for sale."

▬▬▬ Although not aggressively pursued by the plaintiffs, they make reference to the contention that the defendants' interpretation of W.Va.Code, 11–13–2n, deserves no deference because the defendants allegedly changed their position from the initial proposed regulation that would have deduction for line loss and company use to the present regulation that prohibits such deductions. While we fail to find any administrative inconsistency in this case, we do acknowledge that consistency of the defendants' position is one of the relevant factors to be considered.[24]

loss. The fact that some deduction is permitted goes a long way, in our judgment, in justifying the Tax Commissioner's position. Indeed, the only way that we, with our limited powers of review, could disagree with the Commissioner is if we found some specific language in the statute that clearly indicated that more than station loss was required to be deducted. We are unable to find such language. This is a classic example of a taxpayer arguing to the wrong branch of government. The appropriate route for the relief requested in this case is in the West Virginia Legislature.

23. The basic approach taken by courts to administrative interpretations is that set forth by Chief Justice Warren in *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625 (1965):

"When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. 'To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.' *Unemployment Comm'n [of Alaska] v. Aragon*, 329 U.S. 143, 153[, 67 S.Ct. 245, 250, 91 L.Ed. 136, 145 (1946)]. . . . 'Particularly is this respect due when the administrative practice at stake "involves a contemporaneous construction of a statute by the men [and women] charged with

the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new."'" (Citations omitted).

24. Inconsistency is only one of many circumstances that this Court should consider in determining deference. The factors most often recognized by courts as to whether to defer to administrative interpretations were set out by Colin S. Diver in *Statutory Interpretation in the Administrative State*, 133 U.Pa.L.Rev. 549, 562 n. 95 (1985). He lists them as

"(1) whether the agency construction was rendered contemporaneously with the statute's passage, ... (2) whether the agency's construction is of longstanding application, ... (3) whether the agency has maintained its position consistently (even if infrequently), ... (4) whether the public has relied on the agency's interpretation, ... (5) whether the interpretation involves a matter of 'public controversy,' ... (6) whether the interpretation is based on 'expertise' or involves a 'technical and complex' subject, ... (7) whether the agency has rulemaking authority, ... (8) whether agency action is necessary to set the statute in motion, ... (9) whether ... [the Legislature] was aware of the agency['s] interpretation and failed to repudiate it, ... and (10) whether the agency has expressly addressed the application of the statute to its proposed action[.]" (Citations omitted).

Furthermore, it is not clear from the record that the change the plaintiffs identify is in fact an

As noted by the Supreme Court, " '[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is "entitled to considerably less deference" than a consistently held agency view.' " *Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 417, 113 S.Ct. 2151, 2161, 124 L.Ed.2d 368, 383 (1993). (Citations omitted). On the other hand, an agency is permitted to change its position, especially if an earlier interpretation is based on poor judgement or some mistake of law. *See generally, Good Samaritan Hosp. v. Shalala, supra.* To be specific, the Tax Commissioner is not irrevocably bound to his own precedents, so long as he gives a reasoned explanation for the departure. *See, e.g., Rainbow Broadcasting Co. v. F.C.C.,* 949 F.2d 405, 408–09 (D.C.Cir. 1991) (emphasizing "wide latitude" afforded agencies to change their policy through rulemaking).

 The plaintiffs do not allege here that the Tax Commissioner's regulation was arbitrary and capricious on grounds that the purported departure from precedent was inadequately explained. It is apparent from the record that the defendants' radical regulation change did not occur simply based upon impulse. Hearings were held and those opposing the regulation change were permitted the opportunity to respond. Deference to the defendants' interpretation "is especially appropriate where the rule was adopted only after all interest [*sic*] persons were given notice and opportunity to comment[.]" *Virginia Agricultural Growers Ass'n, Inc. v. Donovan,* 579 F.Supp. 768, 773 (W.D.Va. 1984), *aff'd sub nom. Virginia Agric. Growers Ass'n v. U.S. Dept. of Labor,* 756 F.2d 1025 (4th Cir.1985). *See also Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 355–56, 109 S.Ct. 1835, 1848–49, 104

L.Ed.2d 351, 373–74 (1989) (agency amendment to its earlier interpretation came after the prior regulation was subjected to considerable "criticism" and thus was entitled to substantial deference). We believe this flexibility is necessary to allow the Tax Commissioner to respond to rapidly changing "[t]echnological, commercial, and societal aspects of the . . . industry[,]" as well as new information and ideas, as the Tax Commissioner fulfills his delegated duties. *Rainbow Broadcasting,* 949 F.2d at 409. As a matter of law and policy, this is a paradigm example of a complex economic and taxation inquiry that our Legislature has wisely left to resolution by the State's taxing authority pursuant to its statutory mandate.

■ The evolution of this statute and regulation, in our judgment, along with other rules of statutory construction, rebuts the plaintiffs' claim that 110 W.Va.C.S.R. 13, § 1a.2.11 exceeded legislative authority.[25] As noted previously, "there is a presumption that the legislature, when it enacts legislation, is familiar with its prior enactments." *Cary v. Riss,* 189 W.Va. 608, 614, 433 S.E.2d 546, 552 (1993). Indeed, realistically viewed, this extended evaluation of an admittedly complex problem ought to be perceived as a practice to be commended. It is strange irony that the care that preceded the final adoption and implementation of the disputed regulation is today labeled as indecisiveness and inconsistency, and that this supposed indecisiveness and inconsistency should be bootstrapped into reasons to deny the Tax Commissioner's interpretation its due deference. This we refuse to do. The disputed regulation represents a particularly conscientious and reasonable product of the Tax Commissioner's and the Legislature's deliberations, and, therefore, merits this Court's

inconsistency as opposed to a modification of the rule in the rulemaking process.

**25.** Crucial to our decision today is our awareness that the Legislature expressly approved 110 W.Va.C.S.R. 13, § 1a.2.11 as a reasonable interpretation of W.Va.Code, 11–13–2n. Here, we refer to more than post-enactment legislative history but to specific and concrete legislation that gave the Tax Commissioner's interpretation a stamp of approval. If any doubt existed as to the meaning of the statute and what the Legislature intended, that doubt was removed by the adoption of a subsequently enacted omnibus bill. As part of the omnibus bill that was passed in 1990, the Legislature gave its endorsement to the Tax Commissioner's interpretation. The relevant provisions of W.Va.Code, 11–13–2n, and 110 W.Va.C.S.R. 13, § 1a.2.11 went through four legislative stages: (1) the initial enactment providing for taxation on "net generation available for sale"; (2) the adoption of 110 W.Va.C.S.R. 13, § 1a.2.11; (3) legislative hearings as to the validity of 110 W.Va.C.S.R. 13, § 1a.2.11; and (4) the

"great deference."[26] Once the Legislature supports or at least acquiesces in an agency's interpretation of a statute, we are reluctant to interfere if no fundamental rights are abridged.[27]

██ Although, we do not suggest that the defendants' interpretation is the one that we would have constructed, it is apparent the defendants' decision to interpret W.Va.Code, 11–13–2n, to exclude line loss and company use was a well reasoned and rational decision that comports with the language of the statute. When a court reaches the same reading of a statute as a practical construction given it by the enforcing agency, "that is a powerful weight supporting such reading." *Bankamerica Corp. v. United States*, 462 U.S. 122, 132, 103 S.Ct. 2266, 2272, 76 L.Ed.2d 456, 464 (1983). If the defendants' interpretation is "at least as plausible as [the] competing ones, there is little, if any, reason not to defer to ... [their] construction." *Good Samaritan Hosp. v. Shalala*, 508 U.S. at 417, 113 S.Ct. at 2161, 124 L.Ed.2d at 383. Through this policy of deference, the Tax Commissioner, not the courts, retains control over which permissible reading of the statute he will adopt and enforce. Appropriately so because it is the Tax Commissioner, not the courts, who presumably has the technical expertise and political authority to carry out statutory mandates. *See Chevron*, 467 U.S. at 864–66, 104 S.Ct. at 2792–93, 81 L.Ed.2d at 716–17. Justice Brennan, writing for the Supreme Court in *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 568, 100 S.Ct. 790, 798, 63 L.Ed.2d 22, 23 (1980), wisely stated: "[A] court that tries to chart a true course to the Act's purpose embarks upon a voyage without a compass when it disregards the agency's views." This, in brief, states an admonition that has guided the highest courts in this country for many years. Because the Tax Commissioner's interpretation is a reasonable one, we accept it.

██ It is universally recognized that taxpayers have the burden to prove the Tax Commissioner's determination is not correct.[28] In this case, the taxpayers failed to meet that burden. Thus, we find the circuit court did not err when it found that 110 W.Va.C.S.R. 13, § 1a.2.11 is a valid regulation.

## B.

### Equal Protection

██ Plaintiffs also argue that the statute, as implemented, violates equal protection guarantees because it applies the "generation tax" to entities, like the plaintiffs, that generate electricity for sale, while excusing manu-

---

approval of 110 W.Va.C.S.R. 13, § 1a.2.11 by the Legislature in an omnibus bill.

26. We garner additional support for this deferential viewpoint after reviewing the minutes from the November 14, 1989, meeting of the Legislative Rulemaking Committee. The minutes indicate that during the meeting the proposed rule that is in question was reviewed and representatives of the plaintiffs and the Tax Commissioner were permitted to address the committee, answer questions, and distribute information to the committee. A member of the committee even specifically "moved that the proposed rule be amended to allow for line loss and company use." However, this motion failed. It is clear that the committee had the opportunity to discuss and review relevant information concerning this rule.

We cannot ignore the argument that the Legislature not only expressly approved the regulation, but did not change the wording of the statute, despite the fact the regulation in question had been in existence and contested since 1989. "[A] refusal by ... [the Legislature] to overrule an agency's construction of legislation is at least some evidence of the reasonableness of that construction[.]" *United States v. Riverside Bayview*

*Homes, Inc.*, 474 U.S. 121, 137, 106 S.Ct. 455, 464, 88 L.Ed.2d 419, 433 (1985).

27. In their brief, the defendants note that the phrase "net generation available for sale," using the same definition currently contested, has also been used in a new statute. Accordingly, the defendants argue that, because the plaintiffs have not challenged the new tax, "the instant case [is] moot, as the *new* statute has a legislative history incorporating past-practice, and this lawsuit, seeking only prospective relief, does not challenge the existing tax or its definitions." As we have suggested in note 15, *supra*, post-enactment discussions of statutes can be informative, but, as legislative history, they are deserving of little if any weight. On the other hand, while post-enactment statutes revisiting Code sections and maintaining the same language are deserving of some consideration, they too are not necessarily dispositive. The amount of weight given will depend, among other things, upon the use of the contested language in the newer statute. Therefore, a case-by-case analysis is necessary.

28. *See Welch v. Helvering*, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933).

facturers who generate electricity strictly for their own use. These contentions need not long detain us.

 The Due Process Clause of Section 10 of Article III of the West Virginia Constitution incorporates the right to equal protection. As we stated in Syllabus Point 3 of *Robertson v. Goldman,* 179 W.Va. 453, 369 S.E.2d 888 (1988):

"The concept of equal protection of the laws is inherent in article three, section ten of the West Virginia Constitution, and the scope and application of this protection is coextensive or broader than that of the fourteenth amendment to the United States Constitution."

*See also State ex rel. Harris v. Calendine,* 160 W.Va. 172, 233 S.E.2d 318 (1977).

 We have developed what are now familiar doctrines to implement the equal protection command of Section 10. If the challenged classification affects the exercise of a fundamental right or is based upon a constitutionally suspect criterion, the law will not be sustained unless the State can prove that the classification is necessary to the accomplishment of a compelling state interest. *E.g., Lewis v. Canaan Valley Resorts, Inc.,* 185 W.Va. 684, 691, 408 S.E.2d 634, 641 (1991); *Women's Health Center v. Panepinto,* 191 W.Va. 436, 446 S.E.2d 658 (1993). *See generally* Robert M. Bastress, The West Virginia Constitution 88–92 (1995). The list of suspect criteria includes race, national origin, and alienage, and the scrutiny to be applied to laws that engage in such distinctions is the most exacting. Robert M. Bastress, *supra* at 88–92. Our cases have also imposed a heightened standard of review, what we label "intermediate scrutiny," on classifications based on gender or illegitimacy. Under that standard, the State must show that the differential treatment of a gender- or illegitimacy-defined group is substantially related to an important governmental interest. *E.g., Israel by Israel v. W. Va. Secondary Schools Activities Comm'n,* 182 W.Va. 454, 388 S.E.2d 480 (1989); *Shelby J.S. v. George L.H.,* 181 W.Va. 154, 381 S.E.2d 269 (1989). As a practical matter, this intermediate standard operates much more closely to the compelling interest end of the analytical spectrum than to the third standard of review, that which applies to all classifications not affecting a fundamental right or some suspect or quasi-suspect criterion. Under that latter standard, a governmental classification will be sustained so long as it "is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313, 320 (1985); *Donley v. Bracken,* 192 W.Va. 383, 389, 452 S.E.2d 699, 705 (1994); *Lewis, supra.* The presumption of validity that attends the use of the "rational relationship" rule applies with special force to social and economic enactments. *E.g., Syl. pt. 1, Wetzel County Solid Waste Authority v. West Virginia Division of Natural Resources,* 195 W.Va. 1, 462 S.E.2d 349 (1995); Syl. pt. 4, *Lewis, supra, citing;* Syl. pt. 4, *Gibson v. West Va. Dept. of Highways,* 185 W.Va. 214, 406 S.E.2d 440 (1991); Syl. pt. 4, *Hartsock–Flesher Candy Co. v. Wheeling Wholesale Grocery Co.,* 174 W.Va. 538, 328 S.E.2d 144 (1984).

 Because the statute and its implementing regulation implicate no suspect or quasi-suspect class and burden no fundamental right, the "rational relationship" test is the appropriate standard by which the constitutionality of W.Va.Code, 11–13–2n, and 110 W.Va.C.S.R. 13, § 1a.2.11 should be judged. *See Whitlow v. Bd. of Educ. of Kanawha County.,* 190 W.Va. 223, 438 S.E.2d 15 (1993); *O'Neil v. City of Parkersburg,* 160 W.Va. 694, 237 S.E.2d 504 (1977). Under this highly deferential standard, social or economic legislation must be affirmed "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Federal Communications Comm'n v. Beach Communications, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211, 212 (1993); Syl. pt. 1, in part, *State ex rel. Haden v. Calco Awning & Window Corp.,* 153 W.Va. 524, 170 S.E.2d 362 (1969) ("every reasonable construction of the statute must be resorted to by a court in order to sustain constitutionality").

In applying that analysis to this case, we think it is important to understand exactly

how the statute and regulation operate. As explained by the defendants:

"West Virginia Code § 11–13–2n imposes a tax on every person generating or producing electricity in West Virginia 'for sale, profit or commercial use.' Notably absent from the quoted phrase is the word 'manufacturing.' Consequently, the Tax Department does not impose the 2n generation tax on companies which internally generate electricity for their own manufacturing processes. Indeed, the exemption of 'station use' from the definition of 'net generation available for sale' is similarly intended to exclude electricity used by electric power companies in the manufacturing of electricity. Consequently, it is only fair to exclude from 'net generation available for sale' electricity generated by ferro-alloy plants and other co-generators to the extent that such electricity is consumed in the manufacturing process. (To the extent such co-generators produce excess electricity and inject it into the interstate transmission network, it *is* taxed.)" (Emphasis in original).

Thus, the challenged provisions impose the generation tax on all entities who generate electricity to the extent of their "net generation." As we have noted, "net generation" is determined by subtracting station use from the total electricity generated. Plaintiffs' complaint appears to be that equal protection is denied because for some electrical producers the deductible is the same as the total amount they produce. Thus, one could argue that the deductible effectively creates a classification between companies who generate electricity for resale and companies who generate electricity strictly for their own use at the generation site. We see no troubling discrimination here. The Legislature has simply seen fit to tax one activity—generation of electricity for resale—and to not tax another—generation of electricity for self-use. This distinction is commonplace; the Legislature could, for example, impose a tax (income, sales, or gross receipts) on a farmer's sale of his corn but leave completely untaxed the corn he produced for consumption by his family and livestock. This case is no different; there is simply no transaction that triggers the tax. What Justice Jackson

observed in 1949, albeit in a regulatory context, remains as applicable as when he wrote it: "[T]here is a real difference between doing in self-interest and doing for hire, so that it is one thing to . . . [forego taxing] action from those who act on their own and it is another thing to . . . [tax] the same action to be promoted for a price." *Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 116, 69 S.Ct. 463, 468, 93 L.Ed. 533, 541–42 (1949) (Jackson, J., concurring) (city could allow vehicle advertising space used to promote its owner's business but ban vehicle advertising space sold to promote another's business). The Legislature and the Tax Commissioner may also have concluded that the return from a tax on the electricity produced by companies that generate only enough to feed on-site operations cannot justify the costs of collection and enforcement. The tax would not be worth the candle, so to speak.

■ Moreover, this Court has sustained against an equal protection challenge a statute that taxed public utilities for sales of natural gas at a higher rate than that imposed on unregulated companies for identical sales. *United Fuel Gas Co. v. Battle*, 153 W.Va. 222, 167 S.E.2d 890, *appeal dismissed and cert. denied sub nom. United Fuel Gas Co. v. Haden*, 396 U.S. 116, 90 S.Ct. 398, 24 L.Ed.2d 309 (1969). We held that "[t]he differences in the rights and duties of a public utility and a nonutility justify the separate classification in which each is included." 153 W.Va. at 250, 167 S.E.2d at 906. That is effectively the same classification present in this case, as plaintiffs are all public utilities engaged in the business of selling electricity, and the class that they complain has received preferential treatment consists (so far as we can tell from the record) entirely of nonpublic utilities. As we previously suggested: "a person who assails any such classification has the burden of showing that it is essentially arbitrary and unreasonable." Syl. pt. 5, *United Fuel Gas Co. v. Battle, supra.* The plaintiffs have again failed to meet their burden of proof.

■ Plaintiffs also invoke the Equal and Uniform Clause from Section 1 of Article X of the West Virginia Constitution, which

**596**

states, "taxation shall be equal and uniform throughout the State[.]" That provision, however, accords plaintiffs no relief. For taxes other than those levied on property, it merely requires that the taxes not discriminate along geographical lines (i.e., they must be uniform *"throughout* the State"), that taxes be equal within each class of persons or businesses taxed, and (presumably) that there be some reasonable basis for the Legislature's classification scheme. *See In re Assessment of Kanawha Valley Bank,* 144 W.Va. 346, 109 S.E.2d 649 (1959); *Appalachian Electric Power Company v. Koontz,* 138 W.Va. 84, 76 S.E.2d 863 (1953); *Arslain v. Alderson,* 126 W.Va. 880, 30 S.E.2d 533 (1944). We have decided above that the Legislature has a reasonable basis for classifying as it did in § 11–13–2n. Obviously, the section creates no geographical distinctions and treats all businesses within each class the same. Therefore, we conclude that the section is consistent with the Equal and Uniform Clause.

We must exercise considerable caution in using our equality provisions to scrutinize underinclusive challenges to tax legislation— those cases in which the taxpayer objects to his tax because some other group, even if similar, has escaped the levy. Statutes taxing economic activity (as opposed to taxing property) have historically and necessarily drawn lines to accommodate a myriad of ancillary interests, such as the desire to encourage (or discourage) some activity over (or in favor of) another, to balance the equities in a given context, to allow breaks to a group less able to pay, to impose the fiscal burden on those best able to pay, or to achieve administrative efficiencies. Courts should venture into that thicket only with utmost trepidation and only for a very good reason. We find no reason in this case to overcome our reluctance to second-guess a tax classification; we fail to see any invidious or arbitrary discrimination at work in a distinction between electricity-generating companies based on whether the electricity is sold or is retained entirely for station use. That is life in the economic and political trenches.

### III.

### CONCLUSION

For the foregoing reasons, the decision of the Circuit Court of Kanawha County is affirmed.

Affirmed.

MILLER, Retired J., sitting by temporary assignment.

ALBRIGHT, J., did not participate.