723 S.E.2d 642

**PILGRIM'S PRIDE CORPORATION and Pilgrim's Pride Corporation of West Virginia, Inc., Petitioners Below, Petitioners**

v.

**Christopher G. MORRIS, State Tax Commissioner and Jim B. Wratchford, Assessor of Hardy County, Respondents Below, Respondents.**

No. 101627.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 27, 2011.

Decided Nov. 17, 2011.

Dissenting Opinion of Justice Benjamin
Dec. 16, 2011.

Stephen Stockton, Robinson & McElwee, Charleston, WV, Robert H. Albaral, PHV, Stephen W. Long, PHV, Baker & McKenzie, LLP, Dallas, TX, John Paek, PHV, Baker & McKenzie, New York, NY, for Petitioners.

L. Wayne Williams, Attorney General's Office, Charleston, WV, for the Respondent, State Tax Commissioner.

James O. Heishman, Hardy County Prosecutor's Office, Moorefield, WV, for the Respondent, Hardy County Assessor.

McHUGH, Justice:

Pilgrim's Pride Corporation and its wholly-owned subsidiary, Pilgrim's Pride Corporation of West Virginia, Inc., (collectively referred to as "Pilgrim's Pride" or "Taxpayer"), appeal from the August 11, 2010, order

of the Circuit Court of Hardy County through which the lower court granted summary judgment to the State Tax Commissioner ("Commissioner") and the Hardy County Assessor ("Assessor") regarding Taxpayer's lack of entitlement to certain farm-related exemptions for personal property situated in Hardy County for tax year 2009. The trial court ruled that Taxpayer was entitled to rely on one particular exemption[1] in connection with personal property located at its hatchery operation. After carefully reviewing the applicable statutory and constitutional provisions against the record as developed in this case, we determine that the trial court did not err in ruling that Taxpayer was not entitled to any exemptions from personal property taxation in connection with its commercial poultry operation other than the exemption afforded to its hatchery operation.[2]

## I. Factual and Procedural Background

Pilgrim's Pride operates a vertically-integrated poultry production business that involves all phases of the poultry production process. The seven phases of Taxpayer's operation are identified as follows: (1) Hatchery and Garage; (2) Feed Mill and Grow Out; (3) Live Haul Center; (4) Fresh Processing Plant; (5) Protein Conversion Plant; (6) Prepared Foods Plant; and (7) Cold Storage.[3] After its flocks are hatched in hatcheries owned and operated by Taxpayer, they are relocated to unrelated third-party growers[4] who are under contract to Pilgrim's Pride for the purpose of the maturation or "grow out" phase of the operation.[5] Once the birds have matured, Taxpayer's "live haul" crews transport the birds to the fresh processing plant where the chickens are processed for sales purposes. As the final stage of the process, chicken feathers and offal are transferred from the processing plant to the protein conversion plant where those byproducts are turned into poultry meal, poultry fat, and feathers meal.

While the third-party growers provide facilities and labor during the grow out phase of the process, Taxpayer prepares and provides a special proprietary chicken feed and all necessary medical care for the birds. During the time the chicks are physically located on the property of the independent growers, Pilgrim's Pride retains title to the birds and bears the financial risk of loss. A "Boiler Production Agreement" ("agreement") controls all aspects of the "grow out" phase and further provides that the independent growers agree to adhere to Taxpayer's verbal and written recommendations with regard to matters of watering, feeding, brooding, sanitation, litter, vaccination, medication, housing environment, lighting, pest control, and security. The agreement requires the independent farmers to follow Taxpayer's instructions with regard to food, insecticides, medications, disinfectants, herbicides, pesticides, wood preservatives, floor treatments, and rodenticide. The removal and disposal of dead birds, manure, and poultry house litter is also governed by the agreement.

For tax year 2009,[6] Pilgrim's Pride sought exemption from ad valorem taxes on five industrial personal property tax returns it filed with the State Tax Department. Citing statutes that provide tax relief for property used for the "subsistence of livestock" and a "farm or farm operation," Taxpayer claimed to be exempt from personal property taxes. See W.Va.Code § 11–3–9(a)(21), (28) (2008). Pilgrim's Pride claimed one or both of these exemptions for assets associated with its hatcheries, feed mill, "live haul" center, fresh processing plant, and protein conversion fa-

---

1. The "subsistence of livestock" exemption that is found in West Virginia Code § 11–3–9(a)(21) (2008).

2. *But see infra* n. 13.

3. Pilgrim's Pride has a separate tax account number for each of the seven segments of its business operation.

4. During the 2009 tax year, Pilgrim's Pride utilized approximately sixty-one third-party growers for the "grow out" phase of its operation.

5. It was represented during oral argument that the "grow out" phase spans the course of six weeks.

6. 2009 was the first tax year for which Pilgrim's Pride described its business as that of a "poultry farmer." In prior tax years (2006–2008), it had described its operation as "vertically integrated poultry producer," "vertically integrated poultry manufacturer," "poultry processing," or simply "poultry."

cility. Taxpayer did not claim either exemption for personal property used with its prepared foods operation or its cold storage facility.

The Assessor sought a ruling from the Commissioner on or about January 2, 2009, to determine whether any of the personal property Pilgrim's Pride owned in Hardy County was exempt from ad valorem taxation under either the "subsistence of livestock" or the "farm"[7] exemption. *See* W.Va.Code § 11–3–9(a)(21), (28). On February 26, 2009, the Commissioner issued Ruling 09–38 in which it concluded that the "subsistence of livestock" exemption "would apply only to the extent that Pilgrim's Pride has live poultry on its own premises on July first of any (tax) year."[8] Because the primary use of the Taxpayer's land and fixtures was for a vertically-integrated poultry processing plant rather than farming, the Commissioner concluded that the Taxpayer was not entitled to the "farm" exemption.

Pilgrim's Pride challenged the Commissioner's rulings by filing an appeal with the circuit court. Both parties moved for summary judgment and following oral argument, the trial court concluded that while Taxpayer's hatchery qualified for the "subsistence of livestock" exemption, none of Pilgrim Pride's operation qualified for the "farm" exemption. *See* W.Va.Code § 11–3–9(a)(21), (28). Through this appeal, Pilgrim's Pride seeks review of the trial court's ruling.

## II. Standard of Review

Because the parties have stipulated to the governing facts at issue in this case, the only question before us is legal in nature-the applicability of two statutory exemptions from ad valorem taxation. Accordingly, our review of this issue is *de novo. See* Syl. Pt. 1, *Appalachian Power Co. v. State Tax Dep't,* 195 W.Va. 573, 466 S.E.2d 424 (1995) (holding that "[i]nterpreting a statute or an adminis-

trative rule or regulation presents a purely legal question subject to *de novo* review"); *see also* Syl. Pt. 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994) ("A circuit court's entry of summary judgment is reviewed *de novo.*").

## III. Discussion

### A. "Farm" Exemption

In conducting our review of this matter, we are mindful of the maxim that "statutes exempting property from taxation are rigidly construed." *State ex rel. Farr v. Martin,* 105 W.Va. 600, 601, 143 S.E. 356, 356 (1928). In syllabus point two of *In re Hillcrest Mem'l Gardens, Inc.,* 146 W.Va. 337, 119 S.E.2d 753 (1961), we held: "Constitutional and statutory provisions exempting property from taxation are strictly construed. It is encumbent upon a person who claims his property is exempt from taxation to show that such property clearly falls within the terms of the exemption; and if any doubt arises as to the exemption, that doubt must be resolved against the one claiming it."

To determine whether Pilgrim's Pride falls within the parameters of the "farm" exemption, we must first examine the language of the governing statute. Included among the specific classes of property exempted from ad valorem taxation is

> [p]ersonal property, including vehicles that qualify for a farm use exemption certificate . . . and livestock, employed exclusively in agriculture, as defined in article ten, section one of the West Virginia Constitution: *Provided, That this exemption only applies in the case of such personal property used on a farm or farming operation that annually produces for sale agricultural products,* as defined in the rules of the Tax Commissioner.

---

7. While Taxpayer originally referred to the exemption provided by West Virginia Code § 11–3–9(a)(28) as a "farm use" exemption, the State posited, and Taxpayer later concurred, that the better reference would be to identify the subject exemption as "farm or farming operation." For ease of discussion, we will refer to it as the "farm" exemption throughout this opinion. *See id.*

8. The tax ruling further provided that "[w]hatever personal property on hand on that date that is actually and directly used for, and is reasonably necessary for, the care and feeding of livestock on hand on that date, may be exempted from ad valorem taxation."

W.Va.Code § 11–3–9(a)(28) (emphasis supplied). For purposes of our analysis, there are two components to the subject exemption: (1) the property must be personal property that is employed exclusively in agriculture; and (2) the personal property must be used on a farm or farming operation that in turn produces agricultural products for sale. *See id.*

The Commissioner has no problem conceding that Taxpayer's personal property is used exclusively in agriculture and also that Pilgrim's Pride sells agricultural products.[9] What the Commissioner does not agree with is Taxpayer's position that the personal property for which Pilgrim's Pride seeks a tax exemption is "used on a farm or farming operation."[10] W.Va.Code § 11–3–9(a)(28). The term "farm" is defined in the tax statutes as "land currently being used primarily for farming purposes...." W.Va.Code § 11–1A–3(f) (2007). "Farming purposes" is described as "the utilization of land to produce for sale, consumption or use, any agricultural products, including, but not limited to, livestock, poultry ... or any of the products derived from any of the foregoing...." W.Va.Code § 11–1A–3(g). The term "farming operation" is not defined by statute or by regulation.

In circular fashion, Taxpayer suggests that because the chicken products which are processed at the fresh processing plant are agricultural products, it stands to reason that the personal property owned and used by Pilgrim's Pride to perform the processing, and all parts leading up to the processing, constitute property that is being used on a "farm or farming operation." W.Va.Code § 11–3–9(a)(28). The problem with this approach is that it assumes an overly expansive application of the "farm" exemption—one that is not

justified by the state constitution which first authorized the exemption or the statute under which the exemption was created. *See* W.Va. Const. art. X, § 1;W.Va.Code § 11–3–9(a)(28). The fact that the processing plant is used to put agricultural products into commerce as a result of the slaughtering that takes place inside that building does not fulfill the overarching requirement for entitlement to the "farm" exemption—that the land on which that building is located is used primarily for farming purposes—in this case, for the breeding and management of chickens. *See* W.Va.Code § 11–1A–3(f), (g); W.Va.Code § 11–5–3.

█ As this Court first announced in *Farr:* "Under section 1, art. 10, Const., the exemption of property from taxation depends on its use. To warrant such an exemption for a purpose there stated, the use must be primary and immediate, not secondary or remote." 105 W.Va. at 600, 143 S.E. at 356. Under article ten, section one of the constitution, an exemption is authorized for "personal property, including livestock, employed exclusively in agriculture ... and the products of agriculture ... while owned by the producers." W.Va. Const. art. X, § 1. Pursuant to that authorization, the Legislature created the "farm" exemption for personal property employed exclusively in agriculture that is *used on a farm or farming operation* that produces agricultural products for sale on an annual basis. *See* W.Va.Code § 11–3–9(a)(28).

In the tax ruling which addressed whether Taxpayer's operation falls within the purview of the "farm" exemption, the Commissioner began his analysis with the definitions of "farm" and "farming purposes." *See* W.Va. Code § 11–1A–3(f), (g). Because the definition of *farm* requires that the subject land

---

9. The term "agriculture" is defined as "the cultivation of the soil, including the planting and harvesting of crops and the breeding and management of livestock." W.Va.Code § 11–5–3 (2008). "Products of agriculture" are identified within the same provision as "those things the existence of which follows directly from the activity of agriculture, horticulture or grazing, including dairy, poultry, bee and any other similar products, whether in the natural form or processed as an incident to the marketing of the raw material." *Id.*

10. The Taxpayer contends that the key to the "farm" exemption is the use of one's own property to produce agricultural products. By focusing on the nature of what is being produced as opposed to where it is being produced, the Commissioner argues that the Taxpayer overlooks the critical statutory requirement that the *"personal property* [must be] *used on a farm or farming operation."* *See* W.Va.Code § 11–3–9(a)(28) (emphasis supplied).

must be "used primarily for farming purposes," the Commissioner looked to the tax regulation that defines "primary use." *See id.* To constitute a "primary use," the use must be "chief, main or principal." 110 C.S.R. § 3–2.48. The regulation further provides that:

> Whenever property is required to be "used" for stated purposes in order to qualify for exemption under W.Va.Code § 11–3–9, the stated purpose must be the primary or immediate use of the property, and not a secondary or remote use. The property may be used for purposes which are ancillary to the stated purpose, but the ancillary use must further the stated, primary use.

110 C.S.R. § 3–2.48.1.

Because the chickens and the feed are "produced by growers elsewhere," the Commissioner reasoned in Tax Ruling 09–38 that "it cannot be said that the land is being utilized to produce agricultural products." With regard to whether Taxpayer's facility qualified as a farm, the Commissioner concluded that "[a]lthough some of the activities that are carried out on the property are activities that may be associated with farming, it cannot be said to be the *primary* use of the land and its fixtures." *See id.* As a result, the Commissioner ruled that Pilgrim's Pride was not entitled to the "farm" exemption provided in West Virginia Code § 11–3–9(a)(28).

Looking to the statutes that address the valuation of property for taxation purposes, the trial court seized upon a statute which provides that "a corporation is not engaged in farming unless its principal activity is the business of farming...." W.Va.Code § 11–1A–10(b) (2008). Viewing this statutory requirement as controlling, the trial court reasoned that Pilgrim's Pride could only rely on the "farm" exemption if it could first establish that its principal activity was farming. To assist it in deciding whether Taxpayer was engaged in the business of farming, the trial court looked to language found in the business franchise section of the tax statutes. *But see Morris v. Heartwood Forestland Fund Ltd. P'ship,* 228 W.Va. 142, 718 S.E.2d 492 (2010) (reasoning that legislatively-specif-

ic definitions eliminated need to refer outside business franchise statutes for definitions of agriculture and farming). Citing a provision that excludes the "processing of [agricultural] products by persons other than the producer" from qualifying as farming, the trial court determined that Pilgrim's Pride was not a producer of the chickens it sells and, thus, not entitled to the "farm" exemption. W.Va.Code § 11–23–3(b)(8) (2010).

While we find it unnecessary to base our decision on either the property valuation statutes or the business franchise statutes, we find guidance in the trial court's exploration of whether Pilgrim's Pride could qualify as the "producer" of the agricultural products at issue. Within the same statute that defines "agriculture" and "products of agriculture" for personal property taxation purposes, the term "producer" is defined. *See* W.Va.Code § 11–5–3. A "producer" is "the person who is actually engaged in the agriculture, horticulture and grazing which gives existence and fruition to products of agriculture as distinguished from the broker or middleman." *Id.* Based on the stipulation that Pilgrim's Pride relocates its newly-hatched chicks to unrelated, third-party growers who provide the facilities and labor to raise the chickens to maturity, the trial court reasoned that the sixty-one family farmers who actually raise the chickens from pullets to maturity are the producers of Taxpayer's poultry products. Those independent farmers, the lower court opined, would clearly be entitled to the "farm" exemption under discussion. In the same fashion, the trial court determined that the feed mill operation that Taxpayer uses for the purposes of blending together various grains that have been grown elsewhere to create its proprietary feed mixture is not utilized on a farm or farming operation owned by Pilgrim's Pride.

That the entity who seeks to claim the "farm" exemption must be the "producer" of the agricultural products at issue is manifest from both the statutory provisions under discussion as well as the authorizing constitutional provision. Article ten, section one of the constitution expressly authorizes the extension of tax relief to the producers of

livestock and agricultural products. *See* W.Va. Const. art. X, § 1. The "farm" exemption statute makes clear that the exemption only extends to "such personal property used on a farm or farming operation that annually *produces* for sale agricultural products." W.Va.Code § 11–3–9(a)(28) (emphasis supplied). As discussed above, Taxpayer seeks to convince us that it qualifies as a farm or farming operation based on the fact that a product of agriculture is ultimately dispatched from its property in Hardy County, West Virginia. This analysis fails, however, as the statute does not grant exemption from ad valorem taxation for personal property used in connection with agriculture. The exemption has very specific restrictions—it only applies when the property is used on a farm or farming operation that *actually produces* the agricultural products in issue.

■ Pilgrim's Pride, as the trial court correctly reasoned, is not the "producer" of the chicken products that leave Taxpayer's fresh processing plant. This is because the statutory "producer" is the entity "actually engaged in the agriculture . . . which gives existence and fruition to products of agriculture." W.Va.Code § 11–5–3. For purposes of this case, agriculture is defined as both the "breeding and management of livestock." *Id.* Pilgrim's Pride may be the entity who breeds the chickens but those chickens are not raised to maturity on its own property by its own employees.[11] Because its role in bringing the agricultural product at issue to fruition is piecemeal, rather than the holistic

involvement contemplated by both the statute and the constitution, Taxpayer cannot qualify as the "producer" of the agricultural product under discussion. *See id.* Simply put, the structure of Taxpayer's business operation prevents it from qualifying as the statutory "producer" of the chickens under discussion.[12] Accordingly, we hold that a poultry manufacturer who contracts with independent farmers to provide the facilities and labor to raise its chickens to maturity is not entitled to rely upon the exemption from ad valorem taxation provided in West Virginia Code § 11–3–9(a)(28) for farms or farm operations because it does not qualify as a producer of agricultural products under West Virginia Code § 11–5–3.

## B. "Subsistence of Livestock" Exemption

A second type of farm-related tax exemption authorized by article ten, section one of the constitution is known as the "subsistence of livestock" exemption. Pursuant to this authority, the Legislature has provided that "[a]ll property on hand to be used in the subsistence of livestock on hand at the commencement of the assessment year" is exempt from ad valorem taxation. W.Va.Code § 11–3–9(a)(21). The trial court ruled that Taxpayer is entitled to claim this exemption for personal property located at its hatchery operation but not for any other aspect of its operation.[13]

Noting that the parties agreed that the property on hand used at the hatcheries

---

**11.** We wholly reject Taxpayer's contention that "[t]here is no reasonable basis for allowing the contractual relationship between Pilgrim's Pride and the individuals performing the work . . . to dictate the identity of the producer of the chickens." To the contrary, there is a compelling rationale for why Taxpayer's decision to allow third parties to handle the "grow out" phase of its business prevents it from being the "producer" of the birds. By refraining from the daily hands-on involvement in the maturation phase of its chickens, opting instead to allow third parties to "provide the labor, housing, . . . knowledge and expertise," Taxpayer has itself created the impediment that prevents Pilgrim's Pride from qualifying as a "producer"—the entity who is "*actually engaged in the agriculture.*" W.Va. Code § 11–5–3 (emphasis supplied).

**12.** Citing its ownership of the birds it processes "from egg to packaged chicken meat," Taxpayer

sought to distinguish itself from a third-party food processor—an entity for whom the "farm" exemption is unavailable. Ownership, however, does not address the critical statutory element of whether Pilgrim's Pride is the "producer" of the chickens.

**13.** It appears that the trial court also intended to include, by virtue of the parties' agreement, exemption for the personal property used by Taxpayer at its "grow out" facilities. Assuming such an agreement, we do not seek to set that agreement aside. The parties may wish to obtain an amended ruling from the trial court to resolve any lingering confusion about the applicability of the "subsistence of livestock" exemption to both the hatchery and the "grow out" operations of Taxpayer's business.

would be "used in the subsistence of livestock on hand," the trial court focused its analysis solely on whether this exemption would apply to personal property located at the live haul center and the feed mill.[14] The lower court reasoned that

> personal property located at the live haul center is not used for the subsistence of farming, but for the purpose of transporting the chickens to the slaughter house. The feed mill is used for the subsistence of livestock, which is located with unrelated, third-parties, and that livestock is not "on hand" for purposes of exempting Pilgrim's Pride industrial personal property. Therefore, neither the personal property located at the live haul center, nor at the feed mill qualifies for the subsistence of livestock exemption.

Taxpayer seeks to have this Court find that the "subsistence of livestock" exemption applies to not only the hatchery operation but also to the feed mill and live haul aspect of its operations.[15] With regard to the feed mill operation, Taxpayer challenges the trial court's decision that the statutory phrase "livestock on hand" means that the livestock must be physically located with Pilgrim's Pride for the exemption to apply. By regulation, "property on hand" is defined to mean "all personal property primarily, actually and directly used for, and reasonably necessary for the care or feeding of livestock." 110 C.S.R. § 3–2.51. Pilgrim's Pride argues that the regulatory definition lacks a requirement that the livestock be held on the taxpayer's property.[16] Accordingly, Pilgrim's Pride advocates an interpretation of West Virginia Code § 11–3–9(a)(21) which would require

that a particular taxpayer have ready access[17] to property that is then used for the subsistence of livestock that is similarly accessible to the taxpayer.

The Commissioner argues that while the modifying language "on hand" which describes "livestock" is undefined, the cardinal rule of statutory construction requires that such term be given its ordinary, everyday meaning. W.Va.Code § 11–3–9(a)(21); *see* Syl. Pt. 3, *In re Tax Assessment Against American Bituminous Power Partners*, 208 W.Va. 250, 539 S.E.2d 757 (2000) ("In the absence of any definition of the intended meaning of words or terms used in a legislative enactment, they will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which they are used") (add'l citations omitted). According to everyday usage, the Commissioner posits that the term "on hand" implies physical possession or control. Because the bulk of the chickens Pilgrim's Pride owned as of the assessment date at issue were physically located on real property owned by the independent farmers,[18] the Commissioner contends that the livestock were not "on hand" for purposes of the "subsistence of livestock" exemption. *See* § 11–3–9(a)(21).

■ We are persuaded by the Commissioner's argument that the Legislature's use of "on hand" to modify livestock requires that the subject livestock, chickens in this case, be physically located on the Taxpayer's property for purposes of the exemption under discussion. If the modifying language "on hand" had been omitted after the term "livestock," then the Taxpayer could argue

---

**14.** Taxpayer did not claim the "subsistence of livestock" exemption for the fresh processing plant or the protein conversion plant. The Commissioner states that only the industrial property located at the feed mill and the live haul center were contested with regard to the application of the "subsistence of livestock" exemption.

**15.** *See supra* n. 13.

**16.** As the Commissioner observes, however, the regulation pertains solely to describing in further detail what is meant by the phrase "property on hand." It does not attempt to address what is meant by "livestock on hand." *See* 110 C.S.R. § 3–2.51.

**17.** Citing the dictionary definition of "on hand" as "in present possession or readily available," Taxpayer prefers the latter part of the definition as the usage intended by the Legislature. *See Merriam–Webster's Collegiate Dictionary*, 564 (11th ed. 2005).

**18.** Per the stipulated facts, Taxpayer owned 4,014,990 live chickens on July 1, 2008. Of those live chickens, 443,060 chickens were located at the hatchery; 389,810 chickens were located at the fresh processing plant; and the remaining 3,182,120 live chickens were physically located with the 61 independent family farmers.

**604**

that the Legislature intended to permit an exemption for personal property used for the subsistence of livestock a taxpayer owned but allowed to be physically located with a third party. To suggest that the livestock merely be where a taxpayer can gain access to them to qualify as having the same "on hand" does not make sense. What the Legislature sought to do was to carve out an exemption for personal property needed for the care and feeding of livestock that were located on the taxpayer's premises. Not to create a broad-based exemption that would pertain to every aspect of a commercial agricultural operation. Accordingly, we hold that a taxpayer who seeks relief from ad valorem taxation pursuant to the subsistence of livestock exemption under West Virginia Code § 11-3-9(a)(21) (2008) must be able to demonstrate that the personal property for which exemption is sought and the subject livestock are both in the present physical possession of the taxpayer.

■ In this case, the trial court correctly reasoned that the personal property used by Taxpayer at its live haul center has nothing to do with the subsistence of livestock. In fact, just the opposite is true as the animals are being brought to slaughter. With regard to personal property used at the Taxpayer's feed mill operation, the trial court properly determined that the livestock for which the feed was being created were not "on hand" for purposes of the statutory exemption. Accordingly, we affirm the trial court's decision that the Taxpayer was entitled to claim the "subsistence of livestock" exemption in connection with its hatchery operation but not with regard to personal property used at its live haul center and feed mill operation.[19]

Based on the foregoing, we affirm the decision of the Circuit Court of Hardy County.

Affirmed.

Justice BENJAMIN dissents and reserves the right to file a dissenting opinion.

---

[19]. As noted above, it appears that the parties had agreed that Pilgrim's Pride was entitled to claim the "subsistence of livestock" exemption in con-

**BENJAMIN, J., dissenting:**

(Filed Dec. 16, 2011)

I dissent because I believe that the majority does not understand the nature of the modern commercial agricultural enterprise. Through two new syllabus points, each requiring that the taxpayer possess the personal property for which the exemption is sought as well as the subject livestock upon which the exemption is based, the majority fails to understand that today's farm operation takes many shapes, including the vertically integrated poultry production farms of Pilgrim's Pride. The majority opinion appears to wax nostalgic for the days of old when family farms handed down from generation to generation provided the bulk of the agricultural products for food consumption. While those days may have been simpler, perhaps even better, no amount of wishful thinking can ignore the actuality that the modern agricultural operation takes many forms, including that employed by Pilgrim's Pride in the Eastern Panhandle of our State. These large-scale farming operations, which meet the food demands of American consumers, are entitled to the same tax exemptions as are enjoyed by smaller farms.

In order to be eligible for the farming operation exemption in W. Va.Code § 11-3-9(a)(28) (2008), known as the farm exemption, Pilgrim's Pride must show that it (1) employs personal property exclusively in agriculture; (2) annually produces agricultural products for sale; and (3) uses such personal property to produce these products of agriculture on a farm or farming operation.

It is undisputed that raising chickens, as well as selling the chickens so raised, would satisfy the first two prongs of the farming exemption test in W. Va.Code § 11-3-9(a)(28). The third component, whether the personal property for which the exemption is requested is used to produce these chickens on a farm, is where the majority goes wrong. The majority opinion creates new law through Syllabus Point 3, in which it states that a poultry manufacturer which contracts with independent farms to provide the facili-

nection with its "grow out" operation. *See supra* n. 13.

ties and labor to raise its chickens to maturity is not entitled to rely upon the farm use exemption because it does not qualify as a producer of agricultural products. If Pilgrim's Pride is not a producer of agricultural products, then who is?

The majority opinion also rejects Pilgrim's Pride's claim to the exemption under W. Va.Code § 11–3–9(a)(21) for the subsistence of livestock. This exemption was sought for most of the land and fixtures used in the poultry processing plant. The exemption was approved by the tax commissioner and the trial court for the hatchery; however, the rest of Pilgrim's Pride's operation did not qualify for the exemptions. The majority states that in order for the petitioner to receive this exemption, it must demonstrate that the personal property for which the exemption is sought as well as the subject livestock are both in the physical possession of the taxpayer. In the instant case, because Pilgrim's Pride locally outsources the growing phase of its chicken operations to independent contractors who feed and nurture the chicks to maturity, the petitioner is not entitled to exemptions for items used during this process. Again the majority fails to recognize the vertically integrated nature of the petitioner's operation. Pilgrim's Pride controls every aspect of its chicken operations, including hatching the chicks, formulating the feed that is given to the chickens during the grow-out phase, transporting the chicks and grown chickens to and from the hatchery, the production, and the ultimate sale of chicken and its by-products. It possesses the product from every step along the production chain.

For these reasons, I believe that Pilgrim's Pride is entitled to the full use of both of these statutory tax exemptions and respectfully dissent from the majority opinion.