**FILED**

**June 3, 2021**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**Matt Irby, Acting State Tax Commissioner of West Virginia,**
**Petitioner, Respondent below**

**vs.) No. 20-0226** (Kanawha County 14-AA-1)

**Kang M. Zheng, Mei Zheng, and Asian Grill,**
**Respondents, Petitioners below**

## MEMORANDUM DECISION

The petitioner herein, Matt Irby, Acting West Virginia State Tax Commissioner,[1] appeals the February 14, 2020 "Final Order" of the Circuit Court of Kanawha County that reversed the December 4, 2013 "Final Decision" of the West Virginia Office of Tax Appeals ("OTA"). At issue are the Tax Commissioner's assessments of sales tax, business franchise tax, and personal income tax against the respondents herein, Asian Grill, Kang M. Zheng, and Mei D. Zheng.[2]

The Court has considered the parties' written and oral arguments, as well as the record on appeal and the applicable law. This case satisfies the "limited circumstances" requirement of Rule 21(d) of the West Virginia Rules of Appellate Procedure and is appropriate for a memorandum decision rather than an opinion. For the reasons set forth below, the decision of the circuit court is reversed and this case is remanded to the circuit court for entry of an order reinstating the OTA decision.

### I. Factual and Procedural History

Spouses Kang and Mei Zheng own Asian Grill, a restaurant in Charleston that has a few seats for customer dining but primarily serves take-out and delivery food. After eating meals at Asian Grill in September and December 2010, auditors Shannon Hockensmith and Cathy Mills, of the State Tax Department, observed that Asian Grill employees were not entering all sales into the restaurant's digital point of sale cash register. Ms. Hockensmith testified that on one occasion, Ms. Mills paid with a credit card; although the transaction was processed through the restaurant's credit card machine, it was not entered into the cash register. Ms. Hockensmith testified that she

---

[1] This appeal was initially filed by Dale W. Steager, the then-Tax Commissioner, in his official capacity. Because Matt Irby is now the Acting Tax Commissioner, his name has automatically been substituted as the petitioner pursuant to Rule 41(c) of the Rules of Appellate Procedure. The Commissioner is represented on appeal by Assistant Attorney General L. Wayne Williams, Esq.

[2] The respondents are represented by C. Page Hamrick, Esq.

1

paid with cash, and the sale was written on a piece of paper but was not entered into the cash register. This caused the auditors to become suspicious of whether Asian Grill was failing to accurately record its sales and was failing to properly remit to the State all sales tax money that it collected from customers.

These auditors, joined by a third auditor Jean Warner, conducted surveillance on Asian Grill over two partial days and one full day in January of 2011 to obtain a count of customer transactions. Much of the surveillance was performed from the restaurant's parking lot, although the auditors also entered the restaurant at times. The auditors counted the number of customers who ate in the restaurant and counted the number of food orders that were taken out of the restaurant. When counting delivery orders, if they could not see inside the bag or box, they assumed that each bag contained an order for one customer and that each box contained an order for two customers. On January 20, 2011, they surveilled for just part of the day and counted forty-four transactions. During a partial day of surveillance on January 27, 2011, they counted thirty-four transactions. During a full day of surveillance on January 28, 2011, the auditors counted eighty-seven transactions.

Next, the Tax Department requested business records from the respondents including sales reports, tax returns, receipts for credit card sales, receipts for cash sales, and cash register tapes. The records produced by the respondents reflected far fewer customer transactions than the auditors had observed during the surveillance. For the entire day of January 20, the respondents claimed that Asian Grill had only thirty-two customer transactions (as compared to the forty-four transactions counted by the auditors during just part of this day). For the entire day of January 27, Asian Grill reported twenty-eight transactions (the auditors counted thirty-four during part of this day). For the entire day of January 28, Asian Grill reported thirty transactions (the auditors counted eighty-seven). Thus, the auditors observed more sales in the two *partial* days of surveillance than the respondents reported for those *entire* days. Moreover, on the full day of surveillance, the auditors observed almost three times more sales than the respondents claimed.

During the January 20 surveillance, Ms. Mills had entered the restaurant, purchased food for $9.86, and witnessed six orders being taken over the telephone. Asian Grill's records did not include Ms. Mills's purchase or three of the six orders that she overheard. On January 28, 2011, Ms. Hockensmith and Ms. Mills both entered the restaurant and observed four transactions, at least three of which were not listed in Asian Grill's sales records. In addition, the auditors determined that the records the respondents were claiming to be cash register tapes were actually adding machine tapes.[3] As a result of this review, the Tax Commissioner concluded that the respondents' records were insufficient to accurately reflect Asian Grill's sales. Critically, Asian Grill was collecting sales tax from its customers for all the transactions but was not remitting the collected taxes to the State for the non-recorded sales. During the investigation, the Tax Department staff also discovered that the respondents had not paid any West Virginia business franchise taxes for

---

[3] A Tax Department auditor testified that if Asian Grill employees had entered every transaction into the restaurant's point of sale cash register, the register could have produced a record, referred to as a "z tape," listing all daily transactions, what time each transaction occurred, the amount of each transaction, and the amount of sales tax collected from the customer for each transaction.

2005 through 2009, and had only paid the minimum fifty dollars in business franchise tax for 2010 and 2011.

Because the respondents' records were incomplete and inaccurate, a Tax Department auditor used a ratio analysis to calculate the number of transactions that should have been reported and the amount of taxes that should have been paid. She took the number of transactions that Asian Grill reported during the one full day of surveillance, 30, and divided it by the number of transactions that were calculated pursuant to the surveillance, 87, which equals 34.5 percent.[4] She then subtracted 34 percent from 100 percent to conclude that Asian Grill had underreported its sales by 66 percent.[5] The auditor then took the amount of monthly sales that Asian Grill had reported between January 2009 and June 2012, both cash and credit card sales, and multiplied these amounts by the number 1.66 for the purpose of estimating Asian Grill's actual sales.[6]

Using the estimated sales amounts that the auditor calculated, and after giving credit for the taxes that Asian Grill and the Zhengs had paid, the Tax Commissioner issued three assessments. First, the Tax Commissioner issued a sales and use tax assessment to Asian Grill for the period of January 1, 2009 through June 30, 2012 in the amount of $17,413.11 in unpaid tax, plus $2,953.55 in interest, plus $4,284.29 in additions to tax, for a total sales and use tax assessment of $24,650.95. Second, the Tax Commissioner issued a business franchise tax assessment based upon the Zhengs operating the business as a partnership or a pass-through entity. The business franchise tax assessment covered the period October 26, 2005 through December 31, 2011 and was in the amount of $5,424.00 in unpaid tax, plus $1,176.28 in interest, plus additions to tax of $1,356.00, for a total business franchise tax assessment of $7,956.28.[7] Third, the Tax Commissioner concluded that the Zhengs, as owners of Asian Grill, owed additional West Virginia personal income tax for the unreported sales for the period of January 1, 2009 through December 31, 2011 in the amount of $12,398.00, plus $1,641.71 in interest, plus $3,099.50 in additions to tax, for a total personal income tax assessment of $17,139.21.

The respondents challenged these assessments and a two-day evidentiary hearing was held before an OTA administrative law judge. After considering the evidence, the OTA entered an order

---

[4] The Tax Department used only the full-day count for this analysis because without z tapes, it was impossible to match Asian Grill's sales records to the same time of day when the auditors had performed their partial days of surveillance.

[5] The Tax Department auditor also performed an alternate calculation using the number of customers counted during the full day of surveillance, the average size of a household in Kanawha County, and the average menu price at Asian Grill. Using these figures, she calculated a sales total of $1,219.66 for January 28, 2011, which, given reported sales of $463.78, showed that Asian Grill was not reporting approximately sixty-two percent of sales.

[6] As will be discussed *infra*, multiplying the reported sales by 1.66 did not reach the result that the Tax Department was intending.

[7] The Tax Commissioner determined that the respondents had not filed any West Virginia business franchise tax returns for tax years 2005 through 2009.

on December 4, 2013 affirming the assessments in full. In particular, the OTA found that Asian Grill's records were incomplete and inaccurate, and the Tax Department did not abuse its discretion by basing the assessments on a comparison of the surveillance data to the respondents' reported sales. The OTA rejected the respondents' arguments that the Tax Commissioner's methodology constituted a "sample and projection audit" and that it must be done with a statistical validity of ninety-five percent.[8] The OTA concluded that the Tax Commissioner had used the best information available to perform a ratio analysis, and that the respondents had not met their burden of showing that the assessments were clearly wrong, arbitrary and capricious, or contrary to law.

The respondents appealed the OTA's decision to the circuit court. After a lengthy delay, the circuit court entered its final order on February 14, 2020. The court affirmed the OTA's finding that the respondents' records were inadequate and incomplete. The court stated that the OTA's finding regarding the inaccuracy of the records was "credible and undisputed."

However, the circuit court found that the Tax Department's methodology in determining the amount of taxes to assess was arbitrary and capricious. The court was critical of the use of one day of surveillance data to increase three years' worth of sales by sixty-six percent. In addition, although Ms. Hockensmith testified that Tax Department auditors receive on-the-job training on how to perform surveillance audits, the court was critical of a lack of classroom education and a lack of any manual specifying audit policies and procedures. Next, the court found that it was error for the Tax Department to have "grossed up" both the credit card *and* cash sales that Asian Grill reported. Finally, the court concluded in summary fashion that the assessment of business franchise taxes was not sufficiently developed at the OTA hearing. Accordingly, the circuit court reversed the OTA's decision and remanded the case for the issuance of new assessments that "are to be computed in a manner consistent with this Order as well as further fact finding in regard to the Business Franchise Tax issue."[9]

## II. Standard of Review

The Tax Commissioner appeals the circuit court's February 14, 2020 order to this Court. In administrative appeals, we apply a de novo standard of review to legal questions. "Interpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review." Syl. Pt. 1, *Appalachian Power Co. v. State Tax Dep't of W. Va.*, 195 W. Va. 573, 466 S.E.2d 424 (1995). However, factual findings by the OTA are given deference. "Once a full record is developed, both the circuit court and this Court will review the findings and conclusions of the Tax Commissioner under a clearly erroneous and abuse of discretion standard unless the incorrect

---

[8] The respondents argued that to be statistically valid, the auditors needed to perform thirty-six full days of surveillance. Both the OTA and the circuit court found this demand to be unreasonable.

[9] It is unclear exactly what the circuit court wanted the OTA and Tax Commissioner to do when recalculating the assessments on remand because the court did not specify how many days of surveillance data must be used, did not address how meaningful surveillance data could be obtained almost eleven years after the relevant tax years, and did not specify what facts or issues needed to be developed for purposes of reviewing the business franchise tax assessment.

legal standard was applied." Syl. Pt. 5, *Frymier-Halloran v. Paige*, 193 W. Va. 687, 458 S.E.2d 780 (1995).

We are also mindful that when a taxpayer petitions the OTA for a review of an assessment issued by the Tax Commissioner, it is the taxpayer's burden to prove that the assessment is incorrect. "Except as otherwise provided by this code or legislative rules, the taxpayer or petitioner has the burden of proof." W. Va. Code § 11-10A-10(e) (2002); *accord* W. Va. Code R. § 121-1-63.1 (2003) ("The burden of proof shall be upon the petitioner except as otherwise provided by statute or legislative rule."); W. Va. Code R. § 121-1-69.2, in part ( "Failure to produce evidence [at OTA hearing], in support of an issue of fact as to which a party has the burden of proof and which has not been conceded by such party's adversary, may be ground [sic] for dismissal or determination of the affected issue against that party.").

With these standards in mind, we consider the issues on appeal.

### III. Discussion

West Virginia law imposes a consumer sales tax on the sale of tangible personal property and services, including restaurant meals. *See* W. Va. Code §§ 11-15-1 to 11-15-34. The vendor that sells these goods and services is responsible for collecting the sales tax from each customer and remitting the entire amount of collected taxes to the State. *See e.g.,* W. Va. Code §§ 11-15-3 (2003), 11-15-5 (2003). Persons must also pay personal income tax on their taxable earnings, including cash and "under the table" earnings. *See e.g.*, W. Va. Code § 11-21-12 (2019). Moreover, partnerships are required to pay business franchise taxes on capital. *See* W. Va. §§ 11-23-1 (1985), 11-23-4 (1985).

The Tax Commissioner has "the duty to . . . see that the laws concerning the assessment and collection of all taxes . . . are faithfully enforced." W. Va. Code § 11-1-2 (1933). To carry out this duty, the Commissioner may examine any books, papers, and records of a taxpayer. *See* W. Va. Code § 11-10-5a (1986). If the Commissioner believes that a tax return is deficient, he may determine or *estimate* the tax liability and issue a tax assessment:

> If the Tax Commissioner believes that any tax administered under this article has been insufficiently returned by a taxpayer, either because the taxpayer has failed to properly remit the tax or fee, or has failed to make a return, or has made a return which is incomplete, deficient, or otherwise erroneous, he or she may proceed to investigate and determine or estimate the tax liability and make an assessment therefor.

W. Va. Code § 11-10-7(a) (2019); *accord* W. Va. Code § 11-21-12g(d) (2005) (providing that when Commissioner audits for compliance, Commissioner may change taxpayer's computation of taxable income to comply with law).

We begin our analysis by recognizing an important point upon which both the OTA and the circuit court agreed: the respondents' business and tax records were not accurate. The records

failed to include all the restaurant's sales and failed to account for all the sales tax collected from customers. State law requires vendors to maintain complete and accurate records for purposes of sales taxes including "gross proceeds from sales of personal property and services . . . [and] [t]he amount of taxes collected under this article, which taxes shall be held in trust for the state of West Virginia until paid over to the tax commissioner[.]" W. Va. Code § 11-15-4(b) (2003), in part.[10] Likewise, "[e]ach taxpayer shall keep complete and accurate records of taxable sales and of charges, together with a record of the tax collected thereon, and shall keep all invoices, bills of lading and such other pertinent documents in such form as the tax commissioner may by regulation require." W. Va. Code § 11-15-23 (1978), in part; *accord* W. Va. Code R. § 110-15-14.1.1 (1993) (same language as statute).

Legislative rules promulgated pursuant to the statute require that "[e]very person doing business in the State of West Virginia . . . shall keep complete and accurate records as are necessary for the Tax Commissioner to determine the liability of each vendor or vendee for consumer sales and use tax purposes." *Id.* at 110-15-14a.1. More specifically, a vendor must maintain, inter alia, "[r]eceipts from sales" and the "[t]otal purchase price of all tangible personal property purchased for sale, consumption or lease[.]" *Id.* at 110-15-14a.1.1, 110-15-14a.1.3. The records

> shall consist of the normal books of account ordinarily maintained by the average prudent person engaged in the activity in question, including bills, receipts, invoices, *cash register tapes*, or other documents of original entry supporting the entries in the books of account, and all schedules or working papers used in connection with the preparation of tax returns.

*Id.* at 110-15-14a.2 (emphasis added). Thus, the respondents should have retained, and been able to produce, the cash register tapes.

The respondents produced sales records to the Tax Commissioner that clearly failed to include a significant amount of Asian Grill's sales. On two days when they ate meals at the

---

[10] The applicable 2003 version of West Virginia Code § 11-15-4 provides:

> (a) The purchaser shall pay to the vendor the amount of tax levied by this article which is added to and constitutes a part of the sales price, and is collectible by the vendor who shall account to the state for all tax paid by the purchaser.
> (b) The vendor shall keep records necessary to account for:
> (1) The vendor's gross proceeds from sales of personal property and services;
> (2) The vendor's gross proceeds from taxable sales;
> (3) The vendor's gross proceeds from exempt sales;
> (4) The amount of taxes collected under this article, which taxes shall be held in trust for the state of West Virginia until paid over to the tax commissioner; and
> (5) Any other information as required by this article, or article fifteen-b of this chapter, or as required by the tax commissioner.

restaurant, and on three other days when they performed surveillance, the auditors witnessed purchases that were not entered into the cash register. The auditors took specific note of purchases that they made and personally witnessed, but most of those transactions never appeared in the restaurant's sales records. Moreover, the number of customer transactions counted by the auditors during the three days of surveillance was substantially higher than the respondents claimed. Despite demands by the Tax Commissioner, and despite the regulatory mandate to maintain cash register tapes, the respondents never produced Asian Grill's cash register tapes ("z tapes"). As the Tax Commissioner explained, if all purchases had been entered into the cash register, then the daily cash register z tapes would accurately report sales and the amount of sales tax collected. Unfortunately, the issues in this case are of the respondents' own making because of their failure to record and report a substantial amount of their sales. We concur with the lower tribunals' conclusion that the records were incomplete and inadequate.

Also, even though they disagreed on assessment methodology, both the OTA and circuit court agreed that the respondents had failed to remit all sales taxes that they owed. The respondents collected sales tax from customers, but wrongfully converted and kept some of the collected tax money for themselves. "[S]ales taxes are commonly termed 'trust taxes' because the business withholds or collects the taxes on behalf of the state from a third party and holds them in trust until remittance to the state is due." *Schmehl v. Helton*, 222 W. Va. 98, 103, 662 S.E.2d 697, 702 (2008) (internal citation and quotation marks omitted). It is evident from a review of the administrative record that the respondents grossly violated that trust. Likewise, the OTA and circuit court agreed that the Zhengs had failed to pay personal income taxes they owed for the unreported earnings.

Pursuant to a legislative rule, when business and tax records are inadequate, the Tax Commissioner uses the best information available to estimate the taxes owed: "If records are inadequate to accurately reflect the business operations of the taxpayer, the auditor will determine the best information available and will base the audit report on that information." W. Va. Code R. § 110-15-14b.4 (1993).[11] Due to the respondents' concealment of a significant number of transactions, the Tax Department auditors determined that the best information in this case would be obtained by performing surveillance to calculate a daily transaction count for the restaurant and to then compare this data with the sales that had been recorded. The OTA found no error with this approach.

When reversing the OTA, one of the circuit court's concerns was that the Tax Commissioner "grossed up" Asian Grill's *total* sales, both cash and credit, to calculate the assessments. Because credit card sales were processed on the restaurant's credit card machine and the proceeds were direct-deposited into Asian Grill's bank account, the total credit card sales could potentially be pieced together through bank records even though the restaurant's sales reports and tax records were incomplete and inaccurate. Thus, the circuit court concluded that even accepting

---

[11] A legislative rule has the force of a statute and is controlling. *See e.g.*, Syl. Pt. 5, *Smith v. W. Va. Human Rights Comm'n*, 216 W. Va. 2, 602 S.E.2d 445 (2004) ("A regulation that is proposed by an agency and approved by the Legislature is a 'legislative rule' as defined by the State Administrative Procedures Act, W. Va. Code, 29A-1-2(d) [1982] [now codified at W. Va. Code § 29A-1-2(e) (2015)], and such a legislative rule has the force and effect of law.").

the methodology that the Tax Department used in arriving at the percentage of unreported transactions, only the restaurant's reported *cash* sales should have been "grossed up" by sixty-six percent. The Tax Commissioner challenges this conclusion on appeal. The respondents argue that the circuit court was correct and that the bank records are the best information available to show credit card transactions.

Under the particular facts of this case, we reject the circuit court's conclusion that only the reported cash sales should have been increased. The conclusion that the respondents were failing to report sixty-six percent of their sales was reached by counting total daily transactions—both cash and credit. The auditors compared the total number of customer transactions that were observed during surveillance, with the number of customer transactions disclosed in the respondents' sales records. Except when the auditors were personally inside the restaurant during the surveillance, there was no way for them to know whether a particular transaction was paid with cash or credit, or whether most of the customers paid with credit cards, or most paid with cash. As such, it would be arbitrary to apply the ratio analysis to something other than the total reported transactions. Moreover, although the respondents' expert stated that restaurants usually do eighty percent of their sales as credit card transactions, Asian Grill's bank records do not reflect this percentage of credit versus cash deposits. Under the specific facts of this case, there was no way to know what Asian Grill's cash sales were, and no way to know how grossly the respondents had underreported only the cash sales. Finally, the Tax Department gave the respondents credit for all taxes that they had already remitted, which would have been for both cash and credit transactions.

The circuit court was also concerned with whether the Tax Commissioner had used a statistically significant methodology to conclude that the restaurant's sales were underreported by sixty-six percent. The circuit court deemed it "absurd" to rely upon a single day of surveillance data to arrive at the sixty-six percent figure, and to then apply that figure to more than three years of reported sales.[12] The circuit court's concerns about the amount of surveillance data are well-taken. Although the circuit court did not decide how many days of surveillance should have been used, a customer/transaction count made on a single day does not appear to be sufficient to estimate more than three years' worth of a restaurant's sales. Indeed, the Tax Department fails to point to any legal authority or expert opinion to support the use of this limited amount of data. We also join in the circuit court's criticism of the Tax Commissioner's lack of policies, procedures, and employee training for conducting audits of this nature.

Nonetheless, it is unnecessary for us to determine whether "grossing up" the taxpayers' reported sales by sixty-six percent lacked validity in this particular case because, when considering the surveillance data, this adjustment method vastly *understated* the taxpayers' actual sales. According to the surveillance data, the amount of actual sales *should be almost three times higher* than what the reported sales were (87 is almost three times more than 30). Instead, the Commissioner only multiplied the reported sales by 1.66 to arrive at the estimated sales used for

---

[12] As noted above, the respondents argued that to reach a level of statistical significance, the auditors needed to perform twelve full days of surveillance for each of the tax years—in other words, more than thirty-six full days of surveillance over a three-year period. The circuit court rejected the respondents' argument as excessive but did not specify how many days would be needed.

the assessments.[13] As a result, the respondents were taxed on an amount of estimated sales that was far less than what the Commissioner intended. Given this, we cannot say that the ultimate result was unfair to the respondents. Rather, it appears that the respondents benefitted from the Commissioner's mistake. Moreover, given the lengthy passage of time and the lack of any Department policies or procedures to guide this type of audit, it is unclear what the Tax Commissioner would do on a remand. Because the procedure which the circuit court found was arbitrary and capricious was not in fact used, we must reverse the circuit court's order.[14]

Finally, we turn to the circuit court's decision to vacate the business franchise tax assessment. The basis for this ruling was the circuit court's conclusion that the parties had "failed to . . . illuminate" for the court whether the business franchise tax and the personal income tax assessment resulted in two taxes on the same amount of allegedly underreported income. However, this ruling fails to consider that it was the taxpayers' burden at the OTA hearing to prove that the Commissioner's assessments were faulty. *See e.g.*, W. Va. Code § 11-10A-10(e). It also fails to consider that the taxpayers had the burden of proving their case on appeal. In effect, the circuit court has erroneously shifted the burden of proof to the Commissioner to prove that the assessment was correct.

Accordingly, for the foregoing reasons, we reverse the circuit court's February 14, 2020, order and remand this case to the circuit court for entry of an order reinstating the OTA's final decision.

Reversed and Remanded with Directions.

**ISSUED:** June 3, 2021

---

[13] In other words, even if we assume that the surveillance and ratio method that the Tax Commissioner chose to use resulted in the best information available, the Tax Commissioner misapplied its own methodology. The Commissioner concluded that Asian Grill was only reporting thirty-four percent of its sales. To apply a ratio method, the Commissioner should have divided the reported sales by thirty-four percent or multiplied the reported sales by 2.9 (that is, 30 reported sales divided by 87 counted sales, for a divisor of thirty-four percent, or 87 counted sales divided by 30 reported sales, for a multiplier of 2.9). Instead, the Tax Department only multiplied the reported sales by 1.66.

[14] Although the Tax Commissioner is technically prevailing on this appeal, neither the Commissioner nor the OTA should consider this memorandum decision as *carte blanche* to continue using a single day's worth of data to estimate many years' worth of taxes. The Commissioner should ensure that appropriate policies and procedures are adopted and followed to provide a fair, evidence-based methodology if this type of surveillance and ratio method are used in the future.

**CONCURRED IN BY:**

Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison

**DISSENTING:**

Chief Justice Evan H. Jenkins
Justice William R. Wooton


**JENKINS, C.J., dissenting:**

Whether the majority finds the methodology utilized by the West Virginia Tax Department ("Tax Department") material or not to decide this case, I am compelled to call attention to the arbitrary and unacceptable methodology used. I cannot, and this Court should not,[1] endorse the haphazard surveillance method employed by the Tax Department.

This matter began when two Tax Department auditors, Shannon Hockensmith and Cathy Mills ("the auditors"), ate at the Asian Grill in Charleston, West Virginia, and, through personal observations, quickly became suspicious that the Asian Grill was underreporting its sales for consumer sales tax purposes. In particular, the auditors observed transactions that were not processed through the cash register. These observations led to an assessment investigation of the Asian Grill by the Tax Department. As a part of this investigation, the Tax Department conducted surveillance from the parking lot of the Asian Grill over the course of two partial days and one full day. Specifically, surveillance was conducted on January 20, 2011, from 9:00 a.m. to 3:00 p.m.; on January 27, 2011, from 3 p.m. to 10:20 p.m.; and on January 28, 2011, from 10:45 a.m. to 10:15 p.m. As such, surveillance was performed for just slightly above twenty-four hours over the course of three days. This surveillance was conducted to obtain a customer count which could later be compared to reported sales. Specifically, as the majority of the surveillance was conducted in the parking lot, the auditors counted actual customers who entered the restaurant. Additionally, the auditors counted the deliveries made by restaurant employees. For orders where the auditors could not see in the bags, each bag was counted as one transaction and each box as two transactions.

Subsequently, the Tax Department requested various records of the Asian Grill and its owners. The Tax Department obtained only a limited portion of the requested records, including state and federal tax returns and a few credit card and cash receipts. After reviewing the records,

---

[1] The majority did note that

> [a]lthough the Tax Commissioner is technically prevailing on this appeal, neither the Commissioner nor the OTA should consider this memorandum decision as *carte blanche* to continue using a single day's worth of data to estimate many years' worth of taxes. The Commissioner should ensure that appropriate policies and procedures are adopted and followed to provide a fair, evidence-based methodology if this type of surveillance and ratio method are used in the future.

the Tax Department found that they did not accurately reflect what the auditors[2] observed during the surveillance. Accordingly, the Tax Department deemed the records inaccurate and incomplete. Because the records were deemed inadequate, the Tax Department used a ratio analysis in the audit. It was then determined that the Asian Grill was underreporting sales by sixty-six percent. Significantly, the Tax Department used only the one full-day data for this ratio analysis. As a result, the Tax Department essentially extrapolated one day's (or just slightly over eleven hours) worth of purported underreported sales to the entire three-year audit period. Based on these numbers of sales, the Tax Department calculated unremitted sales tax and issued Asian Grill a consumer sales and use tax assessment in the amount of $24,650.95. Pursuant to this audit, other tax assessments were issued, including a business franchise tax assessment totaling $7,956.28 and a personal income tax assessment of $17,139.21.

In its decision, the majority has acknowledged, yet artfully side-stepped, the substantive issue argued by the parties – whether the particular surveillance methodology utilized by the Tax Department was arbitrary and capricious. Instead of addressing the substantive issue, the majority on its own calculations determined that, whether the methodology used was arbitrary or not, the Tax Department misapplied its own ratio to the Taxpayers' benefit. Under the facts and circumstances of this case, I cannot agree. The circuit court did not err in its conclusion that the one-day surveillance method was arbitrary and capricious. The tax assessment methodology employed by the Tax Department was wholly unacceptable and should not be condoned for use in future matters.

West Virginia law requires businesses like Taxpayers' to keep complete and accurate records for taxation purposes. Specifically, West Virginia Code section 11-15-23 provides as follows:

> Each taxpayer shall keep complete and accurate records of taxable sales and of charges, together with a record of the tax collected thereon, and shall keep all invoices, bills of lading and such other pertinent documents in such form as the tax commissioner may by regulation require. Such records and other documents shall be preserved for a period of time not less than three years, unless the Tax Commissioner shall consent in writing to their destruction within that period or by order require that they be kept longer.

Likewise, West Virginia Code of State Rules section 110-15-14a provides, in relevant part, that

> 14a.1   Every person doing business in the State of West Virginia or storing, using, or otherwise consuming tangible personal property purchased from a vendor, and every lessor and lessee of tangible personal property used in this State shall keep complete and accurate records as are necessary for the Tax Commissioner to determine the liability of each vendor or vendee for consumer sales and use tax purposes. . . .

---

[2] A third auditor also assisted in conducting the surveillance.

14a.2   Each record shall consist of the normal books of account ordinarily maintained by the average prudent person engaged in the activity in question, including bills, receipts, invoices, cash register tapes, or other documents of original entry supporting the entries in the books of account, and all schedules or working papers used in connection with the preparation of tax returns.

Furthermore, West Virginia Code of State Rules section 110-15-14b provides that

14b.1   Taxpayer records may be audited by authorized representatives of the Tax Commissioner at any time during regular business hours of the taxpayer at the discretion of the Tax Commissioner or his authorized agent or representative. Any person who maintains such records outside this State shall make such records available for audit where the general records of the taxpayer are kept.

14b.2   The Tax Commissioner may use a detailed auditing procedure or a sample and projection auditing method to determine tax liability.

14b.3   A sample and projection auditing method is appropriate if:

14b.3.1 the taxpayer's records are so detailed, complex, or voluminous that an audit of all detailed records would be impractical or unreasonable;

14b.3.2 the taxpayer's records are inadequate or insufficient, so that a competent audit for the period in question is not otherwise possible; or

14b.3.3 the cost of an audit of all detailed records to the taxpayer or the State will be unreasonable in relation to the benefits derived, and sampling procedures will produce a reasonable result.

14b.4 If records are inadequate to accurately reflect the business operations of the taxpayer, the auditor will determine the best information available and will base the audit report on that information.

Finally, the Taxpayers had the burden below to demonstrate the error in the assessment.

Here, there is no doubt that the Taxpayers failed to keep records that are adequate to accurately reflect their business operations. Accordingly, the Tax Department had the ability to choose an alternative method for determining an appropriate assessment of these unreported taxes. While there is some debate throughout the proceedings as to whether a sample and projection method or a best evidence method was used, the overall issue still is whether one day of surveillance is sufficient to estimate an appropriate assessment of three years of underreporting. As noted by the West Virginia Office of Tax Appeals ("OTA"), there is a "visceral reaction . . . to taking one day's business and extrapolating that out over three years." I agree with the circuit court in this matter that although the methodology used was "completely arbitrary," a bright line rule for percentage confidence intervals should not be drawn; however, "[i]f the sampling methodology used in the present case is the basis of an audit and subsequent assessment, then the

sample must be large enough so as to reasonably relate to reality and not be arbitrary" and/or "used in conjunction with more definite and complete information such as valid and complete credit card sales records over the [specific time] period[.]"

Another aspect of the methodology which I cannot, and this Court should not, endorse is the inclusion of the credit card sales in the total sales utilized to determine the amount of sales tax due. As noted by the lower court, the Tax Department acknowledged that the credit card sales were fully reported and accurate. All receipts deposited in the bank were reported, and the full amount of consumer sales tax was paid on those credit card sales. Still, the Tax Department grossed up both cash and credit card sales and applied the calculated underreporting percentage to the entire amount of sales, not just the cash sales. Asian Grill's expert testified that credit card sales were, on average, equivalent to approximately at least eighty percent of the revenue. The circuit court did not err in its conclusion that applying the calculated underreporting percentage to the credit card sales was "arbitrary, capricious, and unjust" and "should be applied only to the cash sales that were actually reported[.]"

Moreover, I agree with the circuit court that "[a]nother factor that lends itself to finding the [] methodology arbitrary is the lack of training." There was testimony before the OTA that there is neither a training program nor any on the job training for the surveillance audits. Furthermore, there is no manual or other direction on how to conduct the surveillance audits. Accordingly, the methodology used in this matter to impose a tax assessment was clearly arbitrary and capricious. Therefore, based upon the foregoing, I respectfully dissent.

I am authorized to state that Justice Wooton joins in this dissent.