**FILED**

**November 15, 2022**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALSOF
WEST VIRGINIA

No. 22-0293, *Equitrans, L.P. v. Public Service Commission of West Virginia, Ronald Hall, Ashton Hall, and Hope Gas, Inc., dba Dominion Energy West Virginia*

**ARMSTEAD, Justice, concurring in the result:**

The present case involves a rather straightforward question of whether the Public Service Commission ("PSC") has jurisdiction over Equitrans' decisions of whether to provide or discontinue providing natural gas to individuals through taps, commonly referred to as "farm taps," on its gathering line facilities located in West Virginia. I believe the answer to that question is that the PSC does, in fact, retain such jurisdiction, but I reach that conclusion in different manner that would avoid the potential for widespread and unintended consequences I fear will result from the majority's reasoning. The majority's finding that the gathering line in question is not "solely dedicated to … gathering … of natural gas," because it is a "mixed-use" line has the potential to place the majority of pipelines in this State under the PSC's jurisdiction.[1] Further, to reach its conclusion, the majority opinion has utilized an inapplicable definition to endow the PSC with jurisdiction in this case. In sum, the majority opinion is simply a bridge too far. Therefore, while I concur in the ultimate disposition reached by the Court that the PSC has jurisdiction over

---

[1] Lucas Manfield, *West Virginia Is Awash in Natural Gas, But Rural Communities Are Losing Service*, https://mountainstatespotlight.org/2020/09/21/rural-residents-face-loss-of-natural-gas-service/ (last visited Nov. 13, 2022) ("Over 25,000 gas customers in West Virginia receive their gas directly from local wells through what are known as field taps.").

1

the provision of natural gas service to tap consumers from the gathering line in question, I reach such decision for different reasons than those cited by the majority.

The majority opinion relies heavily upon the provisions of West Virginia Code § 24-3-3a (1983) and our prior holding in Syllabus Point 3 of *Boggs v. Public Service Commission*, 154 W. Va. 146, 174 S.E.2d 331 (1970), to reach its conclusion that the PSC has jurisdiction over Equitrans' gathering lines. This argument fails for two reasons. First, West Virginia Code § 24-3-3a *on its face* is inapplicable to this matter. That section provides: "For reasons of safety, deliverability or operational efficiency the commission may, in its discretion, by rule or order, exclude from the requirements of this *section* any part of any pipeline solely dedicated to storage, or gathering, or low pressure distribution of natural gas." W. Va. Code § 24-3-3a(c). (emphasis added). The majority opinion emphasizes the word "solely" but fails to consider that the language of the statute applies only to the designated "section" contained within the statute. Indeed, to determine the applicability of this statutory provision, one must first ascertain "*the requirements of this section.*" Section 3a(b) answers that question:

> (b) The commission may by rule or order, authorize and require the transportation of natural gas in intrastate commerce by intrastate pipelines, by interstate pipelines with unused or excess capacity not needed to meet interstate commerce demands or by local distribution companies for any person for one or more uses, as defined by rule, by the commission in the case of:

2

(1) Natural gas sold by a producer, pipeline or other seller to such person; or

(2) Natural gas produced by such person.

W. Va. Code § 24-3-3a(b). Plainly, Section 3a only applies in specific situations. The first such situation is found when an intrastate pipeline[2] is used to transport natural gas in intrastate commerce.[3] The second instance in which the statute applies is when an interstate pipeline[4] has excess capacity and is being used to transport[5] gas in intrastate commerce. The record in this case does not indicate that the Equitrans gathering facilities at issue fall within either of these two scenarios.

---

[2] "'Intrastate pipeline' means (i) any utility or (ii) any other person, firm or corporation engaged in natural gas transportation in intrastate commerce to or for another person, firm or corporation for compensation." W. Va. Code § 24-3-3a(a)(1).

[3] "'Intrastate commerce' includes the production, gathering, treatment, processing, transportation and delivery of natural gas entirely within this State." W. Va. Code § 24-3-3a(a)(4).

[4] "'Interstate pipeline' means any person, firm or corporation engaged in natural gas transportation subject to the jurisdiction of the FERC under the Natural Gas Act or the Natural Gas Policy Act of 1978." W. Va. Code § 24-3-3a(a)(1).

[5] "'Transportation' includes exchange, backhaul, displacement or other means of transportation." W. Va. Code § 24-3-3a(a)(5).

Section 3a also applies when a local distribution company[6] transports natural gas for any person "for one or more uses" as "natural gas sold by a producer, pipeline, or other seller to such person" or "natural gas produced by such person." Critically, the majority opinion itself makes specific factual findings recognizing that Equitrans does not provide gas distribution services:

> Of note, Equitrans does not own the gas transported through its lines, but it collects a fee for said transportation. Moreover, *Equitrans does not provide utility gas distribution services*, but other public utilities like Hope Gas and Mountaineer Gas *tap into Equitrans' gathering lines, buy the gas, and distribute it to their customers*. The particular line at issue in this appeal, L. No. H-13087, is used by Hope Gas to distribute natural gas to rural consumers via main line farm taps.

(Emphasis added). The facts of this case do not convert Equitrans into a "local distribution company." Equitrans clearly does not sell "natural gas for ultimate consumption." Instead, it is such entities as Hope Gas and Mountaineer Gas, each of which meet the statutory definition of a "local distribution company," ("LDC"), that provide such service. Allowing local distribution companies to provide gas to customers from taps located on the Equitrans gathering line does not convert Equitrans into a "local distribution company."

---

[6] "'Local distribution company' means any person, other than any interstate pipeline or any intrastate pipeline, engaged in transportation or local distribution of natural gas and the sale of natural gas for ultimate consumption." W. Va. Code § 24-3-3a(a)(3).

This Court is required to apply the plain language of the statute. "[A] statute that is clear and unambiguous will be applied and not construed." Syl. Pt. 1, in part, *State v. Elder*, 152 W. Va. 571, 165 S.E.2d 108 (1968). "Where the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to interpretation." Syl. Pt. 2, *Crockett v. Andrews*, 153 W. Va. 714, 172 S.E.2d 384 (1970). "We look first to the statute's language. If the text, given its plain meaning, answers the interpretive question, the language must prevail and further inquiry is foreclosed." *Appalachian Power Co. v. State Tax Dep't of West Virginia*, 195 W.Va. 573, 587, 466 S.E.2d 424, 438 (1995).

The majority opinion fails to apply the clear meaning of the statutory provisions governing PSC jurisdiction, but instead misinterprets the statutory provisions governing the applicability of Section 3a. The majority incorrectly asserts that West Virginia Code 24-3-3a(c) applies to Equitrans by finding that the gathering line is not "solely dedicated to … gathering … of natural gas." The mere allowance of farm taps on a pipeline is insufficient to convert the line to a "mixed-use" line. As acknowledged by the majority, it is actually a separate and distinct LDC, in this case Hope Gas, that serves the natural gas customer in this case. Such LDCs clearly fall within the jurisdiction of the PSC. Equitrans does not assume dual roles as a gathering line and an LDC simply because it permits taps on a line which clearly serves as a gathering line. If such were the case, any

5

natural gas pipeline in West Virginia, regardless of its function, would suddenly fall within the jurisdiction of the PSC as a "mixed-use" or service line simply by allowing a single tap on such line. This is simply a misreading of the term "sole" contained in West Virginia Code § 24-3-3a. Such term refers to the purpose of the line, i.e. transmission, storage, gathering or distribution, and not whether the line contains incidental farm taps.

Secondly, the majority opinion incorrectly applies this Court's prior holding in *Boggs*. In that case, the "transmission line of a public utility" was historically used to provide natural gas to customers, resulting in our holding that:

> Where the transmission line of a public utility has been used directly to serve retail rural consumers over a long period of time, such use constitutes a dedication of that line to the public service and such facility will continue to be so dedicated and the owner thereof will continue to operate as a public utility unless and until permission is obtained from the Public Service Commission to terminate such status.

Syl. Pt. 3, *Boggs*. Here, we do not have a transmission line and Equitrans is not a public utility. Thus, the majority opinion improperly relies on *Boggs* to reach the conclusion that the PSC has jurisdiction over the gathering line's provision of service to the tap customers at issue. While I believe the majority's reasoning is flawed, I nonetheless believe there is a proper means by which the PSC legitimately has jurisdiction in this case.

The record in this case is replete with references to a prior PSC action in which Equitrans and its related companies were allowed to reorganize. The record shows that on January 4, 2007, Equitable Resources, Inc. ("Equitable Resources"), made application to the PSC pursuant to the provisions of West Virginia Code § 24-2-12 (1984),[7] "to modify its current corporate structure through the establishment of a holding company with Equitable Gas operated through subsidiary ownership form." That application further stated that:

> Equitable Gas ratepayers will continue to be subject to the same regulatory jurisdiction of the Commission as to rates, service, accounting and other general matters of utility operations, as it is today.
>
> . . . .
>
> After the merger, Equitable Resources will transfer certain assets and liabilities to NewHoldCo that are more appropriately held by the parent holding company. The assets and liabilities to be distributed to NewHoldCo will not be the regulated assets and liabilities of Equitable Gas.
>
> NewHoldCo will also form a subsidiary, referred herein to GasCoSub, LLC…, a Pennsylvania limited liability company. Immediately following the transfer [noted above] Equitable Resources will engage in a second merger, whereby it will merge out of existence into GasCoSub…. The result of the second merger is that the business of the Equitable Gas Company division of Equitable Resources, Inc. will be operated out of, and be the sole business of, GasCoSub.
>
> ….

---

[7] This Code section will be discussed below.

7

> *No customers of Equitable Gas will be adversely*
> *affected by the proposed reorganization.*

(Emphasis added).

Following the application and a hearing, the PSC issued its order granting the proposed reorganization, with conditions. Notably, the PSC order cites to two specific provisions of West Virginia Code § 24-2-12 in its decision approving the reorganization:

> The commission may grant its consent in advance or exempt from the requirements of this section all assignments, transfers, leases, sales or other disposition of the whole or any part of the franchises, licenses, permits, plants, equipment, business or other property of any public utility, or any merger or consolidation thereof and every contract, purchase of stocks, arrangement, transfer or acquisition of control, or other transaction referred to in this section, upon proper showing that the terms and conditions thereof are reasonable and that neither party thereto is given an undue advantage over the other, *and do not adversely affect the public in this state.*
>
> . . . .
>
> Every assignment, transfer, lease, sale or other disposition of the whole or any part of the franchises, licenses, permits, plant, equipment, business or other property of any public utility, or any merger or consolidation thereof and every contract, purchase of stock, arrangement, transfer or acquisition of control or other transaction referred to in this section made otherwise than as hereinbefore provided shall be void to the extent that the interests of the public in this state are adversely affected, but this shall not be construed to relieve any utility from any duty required by this section.

(Emphasis added).

8

From this language, two important facts are clear. First, there was no question at the time that the application was filed in 2007 that the company that is now Equitrans, and its affiliates seeking reorganization were properly before the PSC. Secondly, the PSC's jurisdiction over the merger/reorganization, as outlined in West Virginia Code § 24-2-12, extended to ensuring that any such merger or reorganization, as proposed by Equitrans' predecessors and affiliates, was authorized by the PSC only to the extent that it did "not adversely affect the public in this state" and was "void to the extent that the interests of the public are adversely affected." W. Va. Code § 24-2-12. Therefore, to ensure that its customers would not be adversely affected by the merger and to obviate PSC concerns about its customers, Randall Crawford, Equitable Resources' senior vice president and president of midstream, tendered an affidavit to the PSC which, as noted in the majority opinion, stated in pertinent part:

> Acceptance of the consent and approval granted in the Order shall constitute an agreement by Equitable Resources, Inc., Equitable Gas Company . . . and any Equitable Resources affiliates that neither they nor their successors shall discontinue service to any distribution system customer served on any of the isolated sections of the Equitable utility distribution system in West Virginia, that are not connected to the interconnected main system in Taylor, Marion and Harrison Counties, without first obtaining the authority of the Public Service Commission of West Virginia, and that they shall make service available to all future applicants who would be entitled to natural gas or transportation service from such isolated distribution facilities under the statutes and applicable regulations to the same extent as if a separation of properties had not taken place[.]

9

The affidavit of Mr. Crawford, thus, was considered by the PSC while exercising its jurisdiction as conferred under the provisions of West Virginia Code § 24-2-12. Equitrans is likely correct in its assertion that the parties may not, *by agreement*, confer jurisdiction on the PSC. The powers and authority of the PSC are granted by statute. However, it is not the affidavit agreeing to jurisdiction that vests jurisdiction within the PSC. The PSC was empowered, by West Virginia Code § 24-2-12, to approve or reject the proposed reorganization involving Equitrans and its affiliates. The PSC opted to approve the reorganization, but clearly did so conditioned upon the representations made in the Crawford Affidavit. The affidavit was designed to ensure that the merger/reorganization would be approved by the PSC, which had stated concerns about the proposal. Almost immediately after the affidavit was tendered, the PSC approved the reorganization. The PSC exercised its statutory jurisdiction over Equitable Resources Equitable Gas, its "affiliates," and "successors" and approved the reorganization to the extent that utility customers would not be "adversely affected" by the reorganization. A company or its affiliates cannot simply make representations to the PSC in order to gain the PSC's approval of a proposed reorganization that was within the PSC's authority to approve or deny, and then deny any obligation to comply with such assurances under the guise that the PSC has, as a result of the reorganization, lost jurisdiction. Indeed, the question of whether a utility customer was "adversely affected" was squarely placed before

10

the PSC by a customer who complained to the PSC that he was refused a tap on the gathering line at issue.

Although, for the reasons outlined herein, I find the majority's specific reliance on *Boggs* is misplaced, Syllabus Point 1 of *Boggs*, stands for the general proposition that PSC jurisdiction is continuing in nature and, when read in conjunction with West Virginia Code § 24-2-12, appears persuasive in this matter:

> Jurisdiction of the Public Service Commission over a public utility will not be considered to be terminated unless the action of the Commission and the circumstances surrounding the case demonstrate clearly and unequivocally its intent to relinquish such jurisdiction.

Syl. Pt. 1, *Boggs v. Pub. Serv. Comm'n*, 154 W. Va. 146, 174 S.E.2d 331 (1970). The PSC's approval of the reorganization of Equitable Resources pursuant to West Virginia Code § 24-2-12, included the continued jurisdiction to enforce the conditions imposed by the PSC as part of such reorganization. The PSC has jurisdiction in this case because it was endowed with jurisdiction by West Virginia Code § 24-2-12 and never lost such jurisdiction.

Accordingly, I concur in the majority's finding that the PSC has jurisdiction over the provision or denial of service to tap customers from the gathering line at issue but

11

would reach this conclusion on the alternate basis set forth herein and believe the reasoning

of the majority may have wide-ranging, unintended consequences.